**1902 ATLANTIC LIMITED, Plaintiff,**

v.

**Ronald E. HUDSON, Colonel, District Engineer, Norfolk Division, U.S. Army Corps of Engineers, Defendant.**

**Civ. A. No. 82–533–N.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 28, 1983.

Edward R. Baird, Jr., Norfolk, Va., for plaintiff.

Diane L. Donley, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

DOUMAR, District Judge.

This matter is before the Court on the complaint of the plaintiff, 1902 Atlantic Limited, in which the plaintiff seeks judicial review of an administrative decision of the United States Army Corps of Engineers (Corps). Pursuant to Section 10 of the Rivers and Harbors Act, 33 U.S.C. Section 403, and Section 404 of the Clean Water Act, 33 U.S.C. Section 1344, the Corps denied plaintiff's application for a permit to fill approximately eleven acres of a tidally-influenced borrow pit for eventual use as an industrial park.

The borrow pit consists of approximately 11 acres of sand and mud flat bottom area (intertidal and subtidal bottoms), and of slightly less than three-quarters of an acre (approximately 32,000 square feet) of wetlands. It is situated in the City of Chesapeake, Virginia, and is zoned industrial. Being triangular in shape, it is completely contained within the embankments of three man-made structures. The northwestern side of the pit consists of the embankment of the main line of the Norfolk and Southern Railway (formerly the Norfolk & Western Railway); to the south is the embankment of United States Route 13 (Military Highway, a limited-access divided highway); and to the northeast is the embankment of the Interstate Highway 464 project. Access to the site can only be gained from Military Highway. The surrounding area is largely industrial and is graced with such occupants as an industrial fertilizer plant, an oil refinery and storage area, a coal electrical generating complex, and an automobile junkyard. The surrounding highways sustain or will sustain a very heavy flow of industrial and private motor vehicle traffic, and the railroad is a very high traffic road through which passes the enormous coal shipments headed for the port in the city of Norfolk.

Until approximately 1954, the site in question was entirely highland and not subject to regulation by the Corps. Pursuant to an agreement between the then owner and the United States, the site was excavated to provide fill material for the construction of a "triple-decker" overpass near the site for U.S. Route 13, thereby creating the borrow pit. Sometime after its excavation, unknown persons constructed a ditch connecting the northerly end of the pit with Mill Dam Creek,[1] a tributary of the Southern Branch of the Elizabeth River. This connection caused the pit to be subjected to inundation by tidal flow from the creek.

Over the years, as a result of the tidal influence from Mill Dam Creek, saltwater wetland vegetation such as *Spartina alterniflora, spartina patens, baccharis halmifolia,* and *iva frutescens* grew up along the fringe of two sides of the pit.[2] Approximately 32,000 square feet of wetlands, as that term is defined at 33 C.F.R. Section 323.2(c), have developed. The pit now consists partially of saltwater wetlands, and of "waters of the United States". Accordingly, the plaintiff concedes that the pit is subject to Section 404 of the Clean Water Act, which provides for and requires Corps approval of a proposed project before a permit to fill can be granted. The plaintiff contends, however, that the Government has no jurisdiction over the pit under Section 10 of the Rivers and Harbors Act.

The plaintiff asserts that the Corps' denial of its permit application has destroyed all economic value the property may have had, thereby amounting to a taking of the property without just compensation in violation of the fifth amendment to the Constitution. The plaintiff also alleges that the Corps issued a permit to the Virginia State Highway Department allowing the highway department to fill about half of the original borrow pit for its Interstate Highway 464 project. By denying the plaintiff

---

1. Mill Dam Creek is a small creek off of the Southern Branch of the Elizabeth River which in turn goes to Hampton Roads which in turn flows to the Chesapeake Bay which in turn flows to the Atlantic Ocean.

2. The third side of the pit, bounded by the Interstate 464 project, currently is bare earth due to the highway construction.

a permit under similar circumstances, plaintiff claims that the Corps acted arbitrarily and capriciously, abused its discretion, and otherwise did not act in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. Section 706. Finally, the plaintiff claims that the requirement contained in 40 C.F.R. Section 230.10(a)(3) that a project be "water dependent" before a permit should be issued to fill wetlands, and upon which the defendant relied in making his decision, is inconsistent with and exceeds the statutory authority granted by the Clean Water Act (and the Rivers and Harbors Act), and is therefore unlawful.

As originally proposed, the plaintiff's project called for the placement of 11,250 cubic yards of construction debris and non-floatable material between the mean high and low water lines, and 5,625 cubic yards of the same type of material below the mean low water line, in order to make the entire pit level with the surrounding grades.[3] The plaintiff's original permit application for this project, dated April 22, 1981, stated that the primary purpose of the project was to develop usable upland for industrial sites. The secondary purpose of the project as stated on the application was to raise the tax base of the City of Chesapeake to provide employment, and to produce developable land. The public benefits expected to be derived from the project were stated to be job openings, an increase in the tax base, and the elimination of a safety hazard and an eyesore.[4]

A joint Federal/State Public Notice of the proposed project was prepared by the Corps and was issued on May 7, 1981, in accordance with Section 404 of the Federal Water Pollution Control Act. The Corps received no comment on, and received no objections to, the proposed project from any environmental organizations or from any private citizens, and no public hearings were requested or held.

A Preliminary Environmental Assessment of the plaintiff's permit application was issued on June 8, 1981. The assessment recommended denial of the application on the grounds that the proposed project was environmentally degrading and not water dependent.

The proposed project was again discussed at a June 11, 1981 interagency meeting attended by representatives of the Environmental Protection Agency (EPA), the Fish and Wildlife Service, the National Marine Fisheries Services, and the Corps of Engineers. The Corps' preliminary recommendation was that the permit be denied because the project was contrary to EPA's Section 404(b) guidelines and to the Corps' Wetlands Policy. The Corps argued that approximately 32,000 square feet of wetlands would be destroyed, the creation of an industrial site was not a water-dependent activity, and other alternative upland sites were available for the project. The attending agencies concurred in the Corps' recommendation. The plaintiff was advised of the Corps' objections and of the preliminary decision to deny the application by letter dated July 10, 1981. The plaintiff was advised further that he could submit additional information with regard to the objections noted in the letter.

By letter dated July 30, 1981, the plaintiff responded to the preliminary decision, and submitted a number of additional reasons in support of its application. The additional information concerned the economic, historic, and health and safety factors affecting the proposed project, along with a review of the alternate site options for the proposed project. Of the information set forth in the letter, the following is of particular importance to this litigation:

1. The site has rail access that many sites in Virginia Beach and Chesapeake would not have.

---

3. The fill material for the project would come largely from the plaintiff's own current construction operations.

4. In addition to its natural aesthetic unattractiveness, the pit has been the location of at least one reported death of a child and has become a repository for the dumping of trash and refuse.

2. One of the strongest benefits of this site over any available alternative sites is its prime central location to the Norfolk, Portsmouth, Virginia Beach, Chesapeake and Suffolk areas. The construction industry operations that would occupy the site, by the nature of their work, would substantially be facilitated by a centralized "hub" location from which equipment, manpower, and materials could be mobilized and sent out to job locations. The site has easy access onto a main local highway (U.S. Route 13) and onto an interstate system (I–64). It also is located adjacent to another major local highway (Bainbridge Boulevard). Alternative sites with the same zoning do not offer the same central location advantages as does this site, nor do they offer comparable natural access to so many motor vehicle arteries.

3. The material for the fill operation would come from locations where the plaintiff is conducting construction operations, material which otherwise would have to be deposited on local land fills. By relieving some of the industrial pressure on local landfills, more capacity for these increasingly scarce landfills will result.[5]

4. An alternative upland site will not accept the quantity of fill to be deposited on the site in question, and thus none of the alternative sites offer the same public benefit of relieving the pressure on local landfills as does the site in question.

5. The site does not offer water access of any meaningful type. It is empty at low tide.[6]

6. The site can be developed for about one-third to one-sixth of the cost of developing a comparably zoned, comparably situated site, assuming such a site were to exist.

7. The City of Chesapeake Planning Commission, Chesapeake City Council, and the Chesapeake Wetlands Board have found that the benefits of the project outweigh the detriments and therefore have issued the necessary local permits for the project. (The Commonwealth of Virginia State Water Control Board also has issued a certification for the project. All state and local agencies thus have approved the project.)

Finally, the letter set forth a modified proposal for the development of the site. The modified proposal called for creating an island in the pit by filling the pit in a triangular shape, leaving drainage canals along the perimeter of the filled area between the fill and the three adjacent embankments. This modification of the proposed project would reduce the amount of displaced or destroyed wetlands from the originally proposed 32,000 square feet to only about 15,000 square feet, or a little more than one-third of an acre. The plaintiff, however, proposed to mitigate even this moderate displacement by replanting along the six sides of the three drainage canals the exact amount of wetlands displaced. Under the modified proposal, therefore, no net destruction of wetlands on the site would occur. In fact, the plaintiff suspects that the replanting actually would result in a net increase of wetlands. This is significant because the site presently is shoaling in naturally. Eventually, the area will revert to upland, the mud and sand bottom will be lost, and the current 32,000 square feet of wetlands will disappear.

The modified plan did not, however, offer any mitigation for the approximately eleven acres of mud and sand bottom that would be filled over. The defendant contends that the presence of water itself, with no growth other than algae, is nonetheless important. When one increases the amount of water in other estuaries by decreasing its placement herein, it is of little consequence since it would be merely a replacement.

---

5. Some, if not all, local public landfills in this area have been closed lately to commercial use. This creates an especially difficult problem for disposal of large amounts of solid fill created by the destruction of brick and concrete buildings.

6. Boat passage to the Elizabeth River is not feasible even at high tide.

The modified plan was discussed at a second joint processing meeting on September 16, 1981. With the federal advisory agencies again concurring, the Corps denied plaintiff's application in its preliminary recommendation. The plaintiff was advised of this decision by letter dated October 26, 1981. There were two grounds given for the preliminary recommendation: the plaintiff had not demonstrated that the proposed project was water-dependent; and although 17,000 square feet of existing wetlands would be left intact, the plaintiff had not satisfactorily proposed to compensate for what the Corps perceived to be 15,000 square feet of wetlands displaced by the project.[7]

On February 18, 1982, Edward Baird, attorney for 1902 Atlantic Limited, submitted arguments in support of the applicant's project by letter to the Corps of Engineers. Mr. Baird stated that the site in question was originally farm land excavated as part of the construction of the "Triple Decker" overpass on United States Route 13. He also proffered an unexecuted copy of an Indenture dated May 8, 1950, between J.Y. DeBaum (sic), Jr., 1902 Atlantic Limited's predecessor in title, and the United States of America. He alleged that language in the temporary easement created a right to fill the borrow pit, that the Government is estopped from denying such right, and that the principals of 1902 Atlantic Limited had relied upon such language when they purchased the borrow pit.[8] He also argued that the Virginia Department of Highways and Transportation had been granted a permit to fill about half of the original borrow pit under similar circumstances. Further, it was the affirmative actions of the federal government, Mr. Baird contended, that had caused the borrow pit to become subject to tidal influence. According to Mr. Baird, these actions enabled the government to invoke its power to regulate the use of the pit. The plaintiff's position, therefore, was that the

government had "bootstrapped" itself into a position of authority over the property and that the government should be estopped from asserting such authority. The Corps responded to the issues raised by Mr. Baird by letter dated April 2, 1982, and the defendant, Colonel Hudson, District Engineer, met with Mr. Baird and the applicants on April 27, 1982 to further discuss the proposed application. On July 27, 1982, Colonel Hudson was served with the complaint in this action. On July 29, 1982, a letter of denial from Colonel Hudson was issued to the plaintiff, 1902 Atlantic Limited. The letter concluded:

The applicant proposes to fill 15,000 square feet of wetlands and approximately 11 acres of intertidal area in a man-made borrow pit for purposes of creating an industrial complex. The project is contrary to both the Corps Wetland Policy and the Environmental Protection Agency's 404(b) guidelines. Although the applicant will be creating 17,000 square feet of wetlands, he is not compensating for the remaining 15,000 square feet of wetlands and the 11 acres of intertidal and subtidal area to be filled. Consequently, I am denying the application since I have determined that issuance of a permit would not be in the public interest.

Following commencement of this litigation, in a purported attempt to clarify his apparent misconception regarding the plaintiff's plan to compensate for all the wetlands displaced by its project, Colonel Hudson issued a document captioned "Supplemental Memorandum for the Record" dated January 7, 1983. The memo reads:

It has come to my attention that in order to clarify any confusion resulting from the submittal of a mitigation plan by 1902 Atlantic Limited on 30 July 1981, the following should be set forth:

1. The original permit application of 22 April 1981 submitted by 1902 Atlantic

---

7. As discussed *infra,* this belief of the Corps was in error, yet continued until shortly before trial, despite the fact that the plaintiff clearly stated in its mitigation plan, contained in the July 30,

1982 letter, that the exact amount of wetlands displaced, if not more, would be replanted.

8. Mr. Baird subsequently withdrew this argument.

Limited proposed filling on (sic) 11.795 acre tidal borrow pit consisting of approximately five acres of intertidal area, six acres of subtidal area, and 32,000 square feet of wetlands.

2. By letter of 30 July 1981, the applicant modified the original proposal by reducing the area of wetlands to be filled from 32,000 square feet to 15,000 square feet. The subject project would still involve the placement of 11,250 cubic yards of construction debris and non-floatable material between the mean high and mean low water lines and 5,625 cubic yards of material below the mean low water line. Further, the applicant proposed to plant approximately 15,000 to 17,000 square feet of wetlands as mitigation. Since there is no upland area available at the site, the planting of 15,000 to 17,000 square feet of wetlands in an area that is already aquatic is not considered to be true mitigation. The elimination of the intertidal and subtidal adjacent areas of approximately eleven acres was not addressed.

3. The permit application was denied because the permanent destruction of approximately eleven acres of intertidal and subtidal areas and 15,000 square feet of wetlands is not in the public interest being contrary to the U.S. Army Corps of Engineers' Wetlands Policy, Volume 42, Number 138, *Federal Register* dated 19 July 1977 and the Environmental Protection Agency's 404(b) Guidelines, Volume 45, Number 249, *Federal Register* dated 24 December 1980. I have reviewed the record and I hereby affirm that decision.

-s-
Ronald E. Hudson
Colonel, Corps of Engineers
District Engineer

Synthesizing the competing contentions, it appears to the Court that the plaintiff has requested a permit to fill a tract of land for eventual industrial development with no net loss of vegetation. Other than the Army Corps of Engineers, no one objects to the proposal, including those public-spirited environmental groups who are so watchful of the public interest.

The plaintiff is the owner of a non-navigable borrow pit which was formerly high land but now experiences tidal fluctuations. The question presented to this Court, therefore, is whether the Army Corps of Engineers may prevent the owner of this property from making a non-water dependent use of the borrow pit where no economically feasible water-dependent purpose for the property exists.

## I. REVIEW OF APPLICABLE STATUTES AND REGULATIONS

### A. *Clean Water Act*

In 1972 Congress enacted the Federal Water Pollution Control Act (now known as the Clean Water Act) which is codified at 33 U.S.C. Section 1251, *et seq.*, as amended. The objective of the Act is to restore and maintain "the chemical, physical and biological integrity of the Nation's waters". Section 101, 33 U.S.C. Section 1251.

Section 301(a) of the Act, 33 U.S.C. Section 1311(a), makes it unlawful to discharge any pollutant into the waters of the United States unless a permit is granted under Sections 402 or 404. The plaintiff does not contest the fact that the material it would utilize to fill the borrow pit falls within the definition of a "pollutant" as that term is defined in Section 502(6) of the Act, 33 U.S.C. Section 1362(6). The plaintiff's activities could nevertheless be exempted from the Section 301 prohibition against discharges if done in compliance with the Section 404 permit program.

Section 404 of the Act, 33 U.S.C. Section 1344, establishes a process for the granting of permits for the discharge of dredged or fill material. Section 404 provides that "the Secretary of the Army, acting through the Chief of Engineers, may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."

Section 502(7), 33 U.S.C. Section 1362(7), defines the term "navigable waters" as "the waters of the United States, including the territorial seas." Numerous courts

have held that Congress intended the term "waters of the United States" as used in the Clean Water Act to have the maximum permissible reach under the Constitution. *See, e.g., United States v. Tilton,* 705 F.2d 429 (11th Cir.1983).

Pursuant to the authority granted under Section 404, the Corps has promulgated various substantive and procedural regulations governing its processing and consideration of dredge and fill permits. The Corps' regulations pertaining to permits for discharges of dredged or fill material into "waters of the United States" are found at 33 C.F.R. Part 323. Section 323.2(a) defines the term "waters of the United States" to include:

(2) Coastal and inland waters, lakes, rivers, and streams that are navigable waters of the United States, including adjacent wetlands;

(3) Tributaries to navigable waters of the United States, including adjacent wetlands ...

(4) Interstate waters and their tributaries, including adjacent wetlands;

(5) All other waters of the United States not identified in paragraphs (a)(1) through (4) of this section, such as isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce.

Paragraph (b) defines the term "navigable waters of the United States" to mean:

(b) ... those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark ... and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce. (See 33 C.F.R. Part 329 for a more complete definition of this term).

Paragraph (c) defines the term "wetlands":

(c) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

Section 320.4 of the Corps' regulations sets forth the general policies that are to guide the Corps in its evaluation of permit applications for dredge or fill activities under the Clean Water Act. The regulations specify that the decision whether to grant a permit, and if granted, the conditions under which the discharge will be allowed to occur, is to be made on a case by case basis. The Corps must decide each case based upon the outcome of a "general balancing process" which weighs a number of factors, with each factor accorded such weight as is relevant to the individual circumstances surrounding the permit application being considered.

The decision whether to issue a permit will be based on an evaluation of the probable impact of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of the general balancing process (e.g., see 33 C.F.R. 209.400, Guidelines for Assessment of Economic, Social and Environmental Effects of Civil Works Projects). That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered; among those are conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage preven-

tion, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production, and, in general, the needs and welfare of the people. No permit will be granted unless its issuance is found to be in the public interest.

Section 320.4(a)(1).

Further policies relating specifically to wetlands are found in subsection (b), which states in paragraph (1) that: "Wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." [9] Section 320.4(b)(1).

Paragraph (2) of subsection (b) administratively defines types of wetlands considered to be important to the public interest on the basis of functions performed by the wetlands.

(2) Wetlands considered to perform functions important to the public interest include:

(i) Wetlands which serve important natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic or land species;

(ii) Wetlands set aside for study of the aquatic environment or as sanctuaries or refuges;

(iii) Wetlands, the destruction or alteration of which would affect detrimentally natural drainage characteristics, sedimentation patterns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;

(iv) Wetlands which are significant in shielding other areas from wave action, erosion, or storm damage. Such wetlands are often associated with barrier beaches, islands, reefs and bars;

(v) Wetlands which serve as valuable storage areas for storm and flood waters;

(vi) Wetlands which are prime natural recharge areas. Prime recharge areas are locations where surface and ground water are directly interconnected; and

(vii) Wetlands (sic) through natural water filtration processes serve to purify water.

Section 320.4(b)(2).[10]

In addition to the applicable regulations and guidelines governing the Corps' evaluation of a proposed discharge of dredged or fill material under Section 404 of the Clean Water Act, the Environmental Protection Agency (EPA) has promulgated guidelines intended to be consistent with and to implement the expressed policies of Congress found in the Clean Water Act. The EPA's guidelines are found at 40 C.F.R. Part 230. Section 230.1(c) and (d) set forth the guiding policy behind the EPA guidelines:

(c) Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.

(d) From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.

Section 230.10(a) of the EPA guidelines contains a general prohibition against the

**9.** As previously noted, the plaintiff's modified permit application will result in no net destruction or alteration of the two-thirds of an acre of wetlands located at the borrow pit, and may even result in a net increase of wetlands at the site. The Court further notes that the language quoted is not prohibitory in nature, but reflects the general policy of the guidelines that allow

for flexibility and individual consideration of the circumstances surrounding each permit application.

**10.** The administrative record below contains no findings that the wetlands located within the plaintiff's borrow pit perform any of the functions listed in subparts i-vii.

discharge of dredged or fill material except in certain narrowly delineated circumstances.

(a) Except as provided under Section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purposes of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

Section 230.10(a)(1)(2). Paragraph (3) of subsection (a) contains the so-called "water-dependency requirement" upon which the defendant in part relied in denying the plaintiff's permit application.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in Subpart E) [11] does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

Section 230.10(a)(3).[12]

The "water-dependency" requirement contained in the EPA guidelines is found in a similar, although somewhat different, form in the Corps' guidelines:

No permit will be granted to work in wetlands identified as important by paragraph (b)(2) of this section, unless the District Engineer concludes, on the basis of the analysis required in paragraph (a), above, that the benefits of the proposed alteration outweigh the damage to the wetlands resource and the proposed alteration is necessary to realize those benefits. In evaluating whether a particular alteration is necessary, the District Engineer shall consider whether the proposed activity is primarily dependent on being located in, or in close proximity to the aquatic environment and whether feasible alternative sites are available. The applicant must provide sufficient information on the need to locate the pro-

11. A wetland is defined in Subpart E as a "special aquatic site."

12. Significantly, the Corps did not find that the proposed fill activity would "cause or contribute to significant degradation of the waters of the United States." Such a finding by itself would require denial of a permit under Section 230.-10(c). The Corps would be hard pressed to make such a finding, however, because the administrative record below contains substantial evidence that the proposed fill activity would cause or contribute to no significant degradation of the waters of the United States. This is significant because the Corps and EPA guidelines under the Clean Water Act apply only to the "waters of the United States", including adjacent wetlands. The Clean Water Act does not provide any authority to consider the effects of a proposed fill activity on bottom land, or the so-called subtidal and intertidal areas, except as the activity affects the "waters of the United States". Having found that no significant degradation of the waters of the United States, except wetlands, would result from the plaintiff's proposed fill activity, the inquiry then turns to what effect the proposed activity would have on the two-thirds of an acre of wetlands located within the borrow pit.

posed activity in the wetland and must provide data on the basis of which the availability of feasible alternative sites can be evaluated.

33 C.F.R. Section 320.4(b)(4).

### B. *Rivers and Harbors Act*

Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. Section 403, prohibits the excavating or filling of any "navigable water of the United States" unless the work is authorized by the Secretary of the Army acting through the Chief of Engineers. Section 10 provides as follows:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commerce the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuse, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. Section 403.

■ The term "navigable waters of the United States" as used in the Rivers and Harbors Act of 1899 has a substantially different, and more limited, meaning than the term as used in the Clean Water Act. In contrast to the Clean Water Act, Congress did not intend the term "navigable waters of the United States" to reach to the full extent of congressional power over commerce as granted by Article 1, Section 8 of the Constitution. *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3d Cir.

1974), *cert. denied* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). Rather, the term is restricted to the traditional definition of navigable waters as of 1899, the time of enactment of the Rivers and Harbors Act. *Id.*

The Corps' regulations recognize the distinction between the traditional definition of "navigable waters of the United States" under Section 10 of the Rivers and Harbors Act, and the more encompassing definition of "waters of the United States" under Section 404 of the Clean Water Act. Section 320.1(c) of Title 33 of the Code of Federal Regulations states that:

The terms "navigable waters of the United States" and "waters of the United States" are used frequently throughout these regulations, and it is important that the reader understand the difference from the outset. "Navigable waters of the United States" are defined in 33 CFR Part 329. These are the traditional waters where permits are required for work or structures pursuant to sections 9 and 10 of the River and Harbor Act of 1899. "Waters of the United States" are defined in 33 CFR 323.2(a). These waters include more than navigable waters of the United States and are the waters where permits are required for the discharge of dredged or fill material pursuant to section 404 of the Federal Water Pollution Control Act Amendments of 1972.

The Corps' regulations, 33 C.F.R. Part 329, then adopt the following general definition of the term "navigable waters of the United States" under the Rivers and Harbors Act:

Section 329.3 General Policies.

Precise definitions of "navigable waters" or "navigability" are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies. However, the policies and criteria contained in this regulation are in close conformance with the tests used by the Federal Courts and determinations made under this regulation are considered binding in regard to the activities of the Corps of Engineers.

Section 329.4 General Definition.

Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

Section 329.5 General scope of determination.

The several factors which must be examined when making a determination whether a waterbody is a navigable water of the United States are discussed in detail below. Generally, the following conditions must be satisfied:

(a) Past, present, or potential presence of interstate or foreign commerce;

(b) Physical capabilities for use by commerce as in subparagraph (a) above; and

(c) Defined geographic limits of the waterbody.

Section 329.8 Improved or natural conditions of the waterbody.

Determinations are not limited to the natural or original condition of the waterbody. Navigability may also be found where artifical [sic] aids have been or may be used to make the waterbody sutiable [sic] for use in navigation.

(a) *Existing improvements: artifical* [sic] *waterbodies.*

(1) An artifical [sic] channel may often constitute a navigable water of the United States, even though it has been privately developed and maintained, or passes through private property. The test is generally as developed above, that is, whether the waterbody is capable of use to transport interstate commerce. Canals which connect two navigable waters of the United States and which are used for commerce clearly fall within the test, and themselves become navigable. A canal open to navigable waters of the United States on only one end is itself navigable where it in fact supports interstate

commerce. A canal or other artifical [sic] waterbody that is subject to ebb and flow of the tide is also a navigable water of the United States.

(2) The artificial waterbody may be a major portion of a river or harbor area or merely a minor backwash, slip, or turning area. (See Section 329.12(b).)

(3) Private ownership of the lands underlying the waterbody, or of the lands through which it runs, does not preclude a finding of navigability. Ownership does become a controlling factor if a privately constructed and operated canal is not used to transport interstate commerce nor used by the public; it is then not considered to be a navigable water of the United States. However, a private waterbody, even though not itself navigable, may so affect the navigable capacity of nearby waters as to nevertheless be subject to certain regulatory authorities.

## II. CORPS JURISDICTION OVER THE BORROW PIT

The plaintiff concedes that pursuant to the regulations the defendant has jurisdiction over the borrow pit under, and in accord with, the provisions of Section 404 of the Clean Water Act. The plaintiff denies, however, that the defendant has any regulatory authority over its man-made borrow pit under Section 10 of the Rivers and Harbors Act of 1899, arguing in essence that the few inches of water, along with the mud and sand, within the borrow pit do not fit within the concept of "navigable waters of the United States" as used in the Act.

As noted previously, the term "navigable waters of the United States" as used in the Rivers and Harbors Act of 1899, was not intended by Congress to reach to the full extent of congressional power over commerce as granted under Article 1, Section 8 of the Constitution. Rather, the term has a more limited meaning, consistent with the concepts of "navigation" and "navigability" as of 1899, the time of enactment of the Rivers and Harbors Act. *United States v. Stoeco Homes, Inc., supra.* The Supreme Court has explained that the concept of

"navigable waters of the United States" does not have a fixed meaning which remains unchanged in whatever context it is being applied, and that all of the Court's cases dealing with the authority of Congress to regulate navigation cannot simply be lumped into one basket. Rather, "any reliance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of 'navigability' was invoked in a particular case." *Kaiser Aetna v. United States*, 444 U.S. 164, 170–171, 100 S.Ct. 383, 387–388, 62 L.Ed.2d 332 (1979).

■ With the above considerations in mind, this Court cannot find that 1902 Atlantic's man-made borrow pit which was not in fact navigable and at low tide is largely empty, falls within the concept of "navigable waters of the United States" as contemplated by Congress in 1899 under Section 10 of that Act.

■ The defendant is correct when he asserts that several courts have recognized that the ebb and flow of the tide is the traditional test for determining whether a waterbody is "navigable water of the United States" for purposes of Section 10 of the Rivers and Harbors Act. As noted above, the Corps' regulations, 33 C.F.R. Part 329, incorporate the ebb and flow of the tide test as a definition of "navigable waters of the United States" for the purpose of implementing its regulatory authority. Were the mere ebb and flow of the tide sufficient to confer regulatory jurisdiction on the Corps, there would be no need for further inquiry, since it is undisputed that the plaintiff's borrow pit experiences tidal fluctuations. But unyielding adherence to the ebb and flow of the tide test would lead to absurd results. Every hole dug in Hampton Roads, any basements, and some swimming pools would then be within the Corps' jurisdiction. This was certainly not the intent of Congress in enacting Section 10.

The United States Court of Appeals for the Fifth Circuit, the circuit wherein most of the reported cases dealing with the Corps jurisdiction over so-called "wetland cases" have arisen, has recognized the absurd results which would obtain if the mere ebb and flow of the tide was enough to confer the Corps' jurisdiction over a body of water. In overruling a District Court which had held to the contrary, the Fifth Circuit determined that the Corps' jurisdictional fingers do not reach so far as to confer jurisdiction over five landlocked canals in southern Florida which exhibited tidal fluctuations subsequent to their excavation. *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1299 (5th Cir. 1976). According to the Court, a contrary ruling would place every hole dug in south Florida within the Corps' jurisdiction. *Id.* In the area of agency regulatory authority, courts often are called upon to define the outer limits of that authority.[13] Applying a rule of reason, the *Sexton* court established a boundary line, holding that the Corps' jurisdictional fingers did not reach waters originally not subject to tidal fluctuations.

■ Similarly, this Court has been asked to draw a line and to rule that the plaintiff's non-navigable, artificially-created borrow pit, even though subject to the ebb and flow of the tide, is beyond the reach of the Corps' jurisdiction. The Court has carefully considered the cases relied upon by the defendant in support of his position. Reason and good conscience, however, dictate that the Corps' jurisdiction does not reach plaintiff's pit. Unwilling to declare the regulations unconstitutional, this Court must hold that the Corps' jurisdiction does not reach as far as the tide may flow.

The cases relied upon by defendant carefully note that the waterbodies involved are capable of some actual navigation.[14] Those

---

**13.** The Corps' regulations specifically recognize that courts will be required to draw lines in this area: "Precise definition of 'navigable waters' and 'navigability' are ultimately dependent on judicial determination, and cannot be made conclusively by administrative agencies." 33 C.F.R. Section 329.3.

**14.** The exception to this statute, cited by the defendant in his post-trial brief, is the case of *Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir.1978). In *Leslie Salt*, however, the nature and character of a waterbody were not in issue. The court simply had been asked to issue a

courts were not called upon to rule that the Corps' jurisdiction under Section 10 reaches a non-navigable, artificially-created body of water simply because it exhibited tidal fluctuations. Any indication by the courts in those cases to the contrary is simply dicta.

The defendant argues that to require a showing of some navigability in tidal areas would eliminate the ebb and flow test, noting that shallow tidal areas such as sloughs and marshes are unquestionably subject to regulation under Section 10. The defendant cites as authority *United States v. De-Felice*, 641 F.2d 1169 (5th Cir.), *cert. denied*, 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981); *see United States v. Stoeco Homes, Inc.*, 498 F.2d at 597. The waterbody in *DeFelice*, however, was not a shallow tidal area such as a marsh or slough, but rather a canal which the court found was navigable in fact. *Id.* at 1174. In the instant case, the plaintiff's artificially-created borrow pit is not a tidal marsh or slough as those terms are commonly used. The pit is man-made, essentially flat on the bottom, and subject to the ebb and flow of merely a few inches of tidal water. This Court has no intention of eliminating the ebb and flow test for navigability, but like any test it must be flexible in its application if it is to have continuing utility.

Even the Corps' regulations appear to admit to some exceptions to, or flexible application of, the expansive jurisdictional reach which the mere ebb and flow of the tide would confer upon the defendant. Subsection (a)(1) of Section 329.8 of the Corps' regulations states that a canal or other artificial waterbody subject to the ebb and flow of the tide is a "navigable water of the United States". Subsection (a)(3) then concludes:

> Private ownership of the lands underlying the waterbody, or of the lands through which it runs, does not preclude a finding of navigability. Ownership does become a controlling factor if a privately constructed and operated canal is not used to transport interstate commerce nor used by the public; it is then not considered to be a navigable water of the United States. However, a private waterbody, even though not itself navigable, may so affect the navigable capacity of nearby waters as to nevertheless be subject to certain regulatory authorities.

33 C.F.R. Section 329.8(a)(3).

The defendant admits that the plaintiff's borrow pit is privately owned. The record contains absolutely no evidence that the borrow pit is or has been used by the public or to transport interstate commerce. In fact, the record below indicates that the filling of the plaintiff's borrow pit would have no effect on navigation or on the navigable capacity of any nearby waters. This is consistent with the nature and character of the plaintiff's borrow pit, a pit which is of absolutely no use or benefit to navigation or commerce. Nor does it have recreational value. Thus, 33 C.F.R. Section 329.8(a)(3) would appear to preclude a determination that the plaintiff's borrow pit is a navigable water of the United States.

■ Assuming that Section 329.8(a)(3) does not preclude a determination that the plaintiff's borrow pit is a navigable water of the United States, this Court, after a careful appraisal of the purpose for which the concept of "navigability" is invoked in this case, does not believe that Congress intended the jurisdiction of Section 10 of the Rivers and Harbors Act to reach the plaintiff's man-made, non-navigable borrow pit.

The dominant theme of the Rivers and Harbors Act was the promotion and protection of navigation. *United States v. Sexton Cove Estates, Inc.*, 526 F.2d at 1297. *Accord United States v. Ohio Barge Lines, Inc.*, 432 F.Supp. 1023 (D.C.Pa.

declarative judgment as to the general shoreward limit of the Corps jurisdiction in tidal areas. The court was not called upon to rule whether a given body of water and the lands underneath fell within the limit the court established. *Leslie Salt* therefore is distinguishable

on its facts. The Court notes also that no other court, including the fifth circuit (as evidenced by its ruling in *United States v. Sexton Cove Estates, Inc., supra* ) purports to have held the Corps jurisdiction to extend to *all* places covered by the ebb and flow of the tide.

1977); *Potomac River Association, Inc. v. Lundeberg Maryland Seamanship School, Inc.*, 402 F.Supp. 344 (D.C.Md. 1975). Although the intent and purpose of Congress in enacting Section 10 was to insure free navigability of interstate commerce, "Congress did not intend to extend federal regulatory jurisdiction to every spot of navigable water in the country". *Minnehaha Creek Watershed District v. Hoffman*, 449 F.Supp. 876 (D.C.Minn.1978), *affirmed in part, reversed in part on other grounds*, 597 F.2d 617 (8th Cir.1979).

In the instant case, the plaintiff's borrow pit is not navigable in fact. The public does not use the borrow pit and there is no evidence that the public ever used the pit for navigable purposes. The borrow pit has no value or benefit to commerce, and the filling of the pit in accord with the plaintiff's revised plan will not have any adverse effect on commerce, on navigation, or on the navigable capacity of any nearby waters. The borrow pit is not a canal, not a pond, not a lake, nor even a minor backwash, slip or turning area.

With all the foregoing in mind, and based on reason and good conscience, this Court cannot find that the plaintiff's man-made borrow pit is the type of waterbody contemplated by Congress to be within the regulatory jurisdiction of Section 10 of the Rivers and Harbors Act. The mere ebb and flow of the tide without more simply does not support the Corps' jurisdiction over this borrow pit. This ruling, however, does not eliminate the ebb and flow test of navigability. Rather, such a determination merely recognizes that any test of navigability must be applied flexibly and with reason.

### III. STANDARD SCOPE OF REVIEW

The Court's task now becomes one of attempting to analyze the Corps' application of the sometimes confusing and inconsistent regulatory guidelines to the plaintiff's request for a permit to allow it to return part of its man-made borrow pit to its previous condition as upland, in light of statutory authority and the applicable scope and standard of review.

The Administrative Procedure Act (APA), in pertinent part, provides as follows:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law.

In reviewing agency action under the APA, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *E.I. duPont de Nemours & Co. v. Train*, 541 F.2d 1018–1026 (4th Cir.1976) *citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Although the Court is not to conduct a de novo review, the Court's inquiry is substantial, and the agency's decision must be rationally based. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823. Furthermore, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. "The agency must 'explicate fully its course of inquiry, its analysis and its reasoning'. After the fact rationalization by counsel in brief and argument does not cure non-compliance by the agency with stated principles." *E.I. duPont de Nemours & Co. v. Train*, 541 F.2d at 1026.

The scope of review of agency action under the APA is relatively narrow, and generally is limited to the administrative record on which the decision was made.[15] *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The Court in *Camp* indicated, however, that where an agency's failure to explain its rationale frustrates judicial review, a court's scrutiny of explanatory affidavits is permissible. 411 U.S. at 142–43, 93 S.Ct. at 1244. In addition, it has been held that a court may consider evidence outside the record "to see what the agency may have ignored." *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). "The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980). But consideration of affidavits containing "new rationalizations," *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir.1977), or otherwise addressing "the propriety of the [agency's] decision itself," *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 286 (D.C.Cir.1981), is beyond the court's proper role.

## IV. THE CORPS' ACTION WAS ARBITRARY AND CAPRICIOUS

After reviewing the administrative record denying plaintiff's application for a permit, the Court at trial noted that the tenor of the defendant's findings and conclusions appeared largely to be result oriented. That is, the Court felt that an *a priori* decision was made to deny the plaintiff a permit, and that the Corps then attempted to build a record that would sustain the denial. Whether or not that was the case, the defendant's decision was clearly in error and was not rationally based. Review of the defendant's decision indicates that he failed properly to consider all relevant factors, that several irrelevant factors improperly were considered, and that he failed to engage in a proper balancing test. *See E.I. duPont de Nemours & Co. v. Train, supra; Citizens to Preserve Overton Park, Inc. v. Volpe, supra.*

The plaintiff contends that the defendant acted arbitrarily in relying almost exclusively on the so-called "water dependency" rule set forth in the Corps' regulations at 33 C.F.R. Section 320.4(b)(4), *supra*, and in the EPA guidelines at 40 C.F.R. Section 230.10(a)(3), *supra*. Thus, plaintiff argues defendant placed "a thumb on the scale of justice unbalancing a weighing of all the factors" that the defendant is required to weigh. The plaintiff's position is well taken.

The Corps' regulations very clearly require the defendant to decide whether to issue a permit based on an evaluation of the probable impact of the proposed activity and its intended use on the public interest. 33 C.F.R. Section 320.4(a)(1). In making his evaluation, the defendant is required to weigh carefully all those factors which become relevant in each particular case. *Id.* In weighing the relevant factors, the regulation mandates that the "benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." *Id.* The regulation then goes on to state that the outcome of this general balancing process dictates what the defendant's decision shall be. "The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of the general balancing process." *Id.* The regulation not only embodies Congressional concern for the protection of important resources, but also contains a directive expressed throughout

---

**15.** Although the defendant appears to argue otherwise, the standard and scope of review under the APA applies in this litigation only so far as the plaintiff seeks statutory review of the Corps' decision to deny it a permit to fill part of the borrow pit. Review of the plaintiff's non-statutory claims are not governed by the APA, however, and the Court's review of such claims therefore is not limited solely to matters contained in the administrative record. The Court is aware of no cases wherein a contrary conclusion was reached, and the defendant has cited none.

the congressional consideration of the 1977 amendments to Section 404 to curb what many members of Congress perceived as the Corps' penchant for overregulation, particularly in cases of de minimus environmental concern.[16] The regulation achieves these dual goals by directing that the defendant's decision reflect not only national concern for the protection of important resources, but reflect national concern for the *utilization* of resources as well. *Id.*

The Massachusetts Federal District Court recently had occasion to consider whether the water dependency regulation is a prerequisite to the issuance of a permit to fill. The court ruled that construing the Corps' regulations and EPA guidelines in such a manner was misguided. *Hough v. Marsh,* 557 F.Supp. 74, 83 (D.Mass.1982). The court further held that the provisions

required only that the district engineer consider the water dependent needs of a proposed project along with feasible alternative factors as a part of the general weighing process prescribed by the statute and the regulations. *Id.*

■ In light of the clear language of the Corps regulations, 33 C.F.R. Section 320.4(a)(1) and the statute, this Court agrees with the cited authority that the so-called water dependency requirement is not a prerequisite to the issuance of a permit to fill under the Clean Water Act. Rather, water dependency merely is one more factor to be considered by the defendant in the general balancing process.[17]

A thorough reading of the defendant's report dated July 29, 1982 denying the plaintiff's permit application, reveals that the defendant, if not actually in error, was

---

16.  *See generally* Clean Water Act of 1977, Pub.L. No. 95–217, Section 404, 91 Stat. 1566, 1600 *et seq.* (1977), reprinted in Senate Comm. on Env't. and Pub. Works, 95th Cong., 2d Sess., Legislative History of the Clean Water Act of 1977, a Continuation of the Legislative History of the Federal Water Pollution Control Act, Vol. 3–4 (1978).  The following colloquy during floor debate on the Senate bill (S.1952) between Senator Muskie, the Senate manager of the 1977 amendments, and Senator Bentsen is illustrative:

&ast; &ast; &ast; &ast; &ast; &ast;

MR. BENTSEN.  Mr. President, for 2 years now, the people of America have lived with Section 404 of the Federal Water Pollution Control Act as interpreted by the courts and administered by the Corps of Engineers.  Mr. President, I can now say with certainty that this is one Federal program that has been weighed in the balance and found wanting.  Section 404 has become a symbol to many Americans of how a well-intentioned legislative initiative can turn into a quagmire of disruption, frustration, and bureaucratic entanglement for the ranchers, farmers, foresters, and average citizens of this country. The message we have heard from the people is clear and unequivocal; they have told us with their letters, their telegrams, their telephone calls, and their personal appeals that they are sick and tired of attempting to cope with the provisions of Section 404.  With the passage of time, their anxiety has turned to resentment, their concern has become determination.

SECTION 404 has assumed an importance that extends far beyond dredge and fill activities; it has become synonymous with Federal overregulation, overcontrol, cumbersome bu-

reaucratic procedures, and a general lack of realism.  Accordingly, our debate today will be seen by many Americans as a test case in which Congress attempts to come to grips with a blatant example of unwarranted Federal intrusion into the daily lives of millions of Americans, the sort of intrusion that costs us the support of the people as we strive to realize commendable objectives.

&ast; &ast; &ast; &ast; &ast; &ast;

MR. MUSKIE.  I think it ought to be clear that no Member of the Senate, as far as I know, defends Section 404.  The Senator knows that I vigorously opposed the interpretation of Section 404 which the Corps of Engineers undertook to implement ...  I just thought it might be useful to have that point stated.

*Id.* at 901–902.

&ast; &ast; &ast; &ast; &ast; &ast;

During Senate consideration of the conference report on the Clean Water Act of 1977, Senator Muskie, who also was one of the Senate conferees, stated that the statements made during Senate debate, such as the statements above, adequately reflect the legislative intent with respect to Section 404.  *Id.* at 470.

17.  The Court's resolution of this issue thus renders academic the plaintiff's claim that, were the defendant's interpretation of the regulation as a threshold requirement to prevail, the so-called water dependency regulations would be unlawful as beyond statutory authority.  Moreover, the fact that the property adjacent was permitted to fill for a non-water-dependent use, i.e., a limited access highway, would not be consistent.

confused as to the proper application of the so-called water-dependency provisions of the regulations. The report purports to set forth the type of public interest review required by the regulations. Missing, however, is any indication that the defendant actually weighed all the factors listed in his report. The report also lacks an evaluation of the weight accorded those factors. Rather, the defendant appears to have relied on his belief that the plaintiff's proposal was not "water dependent" as the primary basis for denying the plaintiff's application.[18] In his memorandum in support of his motion for summary judgment received January 7, 1983, defendant argues that water dependency is a "threshold" requirement for the issuance of a permit to fill, the lack of which "prohibited the issuance of a permit to plaintiff ...." Memorandum at 23. Such reliance, as noted above, is misguided, and by itself requires this Court to find that the decision to deny the permit was not "based on a consideration of the relevant factors," thus amounting to a "clear error of judgment." *E.I. duPont de Nemours & Co. v. Train, supra.*

As noted, the Corps' regulations direct that "all factors which may be relevant to the proposal must be considered." 33 C.F.R. Section 320.4(a)(1). Among the factors specifically to be considered are the following: conservation; economics; aesthetics; general environmental concerns; fish and wildlife values; historic values; flood damage prevention; land use; navigation; recreation; water supply; water quality; energy needs; safety; food production; and, in general, the needs and welfare of the people. *Id.* As just discussed, subsection (b)(4) also directs the defendant to consider as one factor the need for the proposed project to be located in the aquatic environment, as part of his determination of whether the benefits of a proposed alteration to wetlands will outweigh the detriments, and whether the alteration is necessary to realize those benefits.

Before expressing his views on the various factors the regulations require him to consider, the defendant's report purports to set forth the views of state and local authorities on the proposed project. Significantly, however, the only negative view expressed was *not* directed at the plaintiff's project, but was an opinion rendered by a state agency with regard to an entirely different project proposed by an unrelated applicant some three years earlier. The defendant now concedes that the inclusion of this item was irrelevant to the consideration of the plaintiff's application, but contends that the item was only included as background material. Despite this after-the-fact rationalization of the reason for the item's inclusion in the defendant's report, the Court cannot seriously believe that the item was intended to have a benign effect. If that were the case, the comments made by state or local agencies or authorities on every other permit application regarding the subject borrow pit would have been included but they were not. The Court emphasizes in this regard that, despite notice and an opportunity to be heard, no objections to the plaintiff's proposal to fill the borrow pit were received from anyone, including state and local agencies. Nor were complaints received from any of the many environmental groups and organizations to whom the Corps regularly mails notice of permit ap-

---

18. The defendant's report states at page 5 that:
[T]he applicant has not demonstrated a water dependent need. An industrial complex does not need to be located in a tidal borrow pit in order to fulfill its basic mission. At page 9 the defendant states:
... the applicant has demonstrated a water dependent need for the industrial park to be located in a tidal borrow pit.
\* \* \* \* \* \*
... Due to the fact that the project does not have a water dependent need and it is contrary to the 404(b) guidelines and the Corps

Wetland Policy, I have determined that ... [denial of the permit] is the only action in the public interest.
Although the defendant purported to evaluate some of the factors the regulations require to be weighed in the general balancing process, as the above-quoted material indicates the primary basis found in his report for the denial of the plaintiff's permit application was defendant's opinion that he was required to deny the permit because he believed the plaintiff's project had no water dependent need.

plication hearings. In fact, all the relevant state and local agencies issued permits for the plaintiff's project.

In expressing his "views" on the various factors the regulations require the district engineer to weigh, the defendant made several other errors of fact, and tended to minimize any beneficial effects the project would have on a given factor. To the extent that they are necessary for a proper analysis of this case, the "views" of the defendant as to the effect of the proposed project on the factors he considered are set out below, along with the Court's analysis.

### A. NAVIGATION

The defendant's view is that the borrow pit is very shallow and most likely not used by the boating public on a regular basis. The Court found no evidence at trial that the borrow pit had ever been used for boating or for navigable purposes, nor could it ever be so used because there is no navigable access to the borrow pit. The Court found further, based on the overwhelming evidence before it, that the plaintiff's proposed project would have no adverse effect on navigation or on the navigable capacity of any nearby navigable water. The Court made these findings based on the evidence within the record and on evidence presented outside the record, based on the defendant's failure to indicate on the record that he was aware of and weighed these facts in his decision. *See Camp v. Pitts, supra; County of Suffolk v. Secretary of Interior, supra; Asarco, Inc. v. EPA, supra.*

### B. FLOOD DAMAGE PROTECTION

The defendant's view is that the effectiveness of the borrow pit's wetland system in providing flood damage protection is negligible. This view is supported by the record.

### C. FISH AND WILDLIFE

The defendant's view is that most of the area proposed to be filled by the plaintiff consists of non-vegetated intertidal area. The defendant then notes that the proportion of an estuary's total primary production occurring in an intertidal area is small relative to that contributed by salt marshes and the water column. The real value of intertidal flats, according to the defendant, is that it provides an area for the deposit of some of the exported production of salt marshes, and thus serves as a feeding site for benthic invertebrates. In turn, these life forms serve as a food source for higher level consumers. The plaintiff's project, according to the defendant, would precipitate the loss in ecological value the intertidal area presently serves.

There are several problems with the defendant's views in this regard. First, the defendant has not indicated what detrimental value or weight he assigned to the expected loss of the "intertidal" area (which, by the defendant's use of the term, apparently includes the sub-tidal area or bottom of the borrow pit). Second, the defendant made no specific finding that the subject "intertidal" area contributed any of the ecological values ascribed by the defendant to "intertidal" areas in general. Third, as noted *supra,* the defendant has no authority to regulate the sub-tidal bottom of the plaintiff's borrow pit, since the Clean Water Act confers no regulatory authority over the bottom, and the Rivers and Harbors Act is inapplicable. Fourth, the defendant's own expert at trial indicated that the ecological value of intertidal and subtidal areas may generally be overrated. The plaintiff's expert went much further. At the least, the defendant concedes that the ecological value of intertidal areas are subject to debate within the scientific community. Finally, contrary to the defendant's post-trial arguments, he did not find in the administrative record, including the "Supplemental Memorandum for the Record" dated January 7, 1983, that "the navigable waters in this case had substantial ecological value."

Addressing this same factor, the defendant determined that fish found in the borrow pit probably were limited to three species, with invertebrates limited to two species plus various polycheates. Again, however, the defendant has adduced no evidence in the record that any marine life exist in the subject borrow pit, or that any

would be displaced or destroyed by the plaintiff's proposed project. The defendant did conduct a bird survey on three occasions, however, and found several species foraging at the site. There is no evidence in the record, however, suggesting that wildlife or fish use the borrow pit as a nesting or spawning area.

Finally under this factor, the defendant exhibits perhaps his most fundamental misconception regarding the plaintiff's proposed project. The defendant states that the "displacement" of the 32,000 square feet of wetlands at the site will *eliminate* the large volume of detritus that serves as a vital link in the aquatic food web, and which is produced by the wetlands and flushed into the adjacent waterway. The defendant then states that, as a result, the project did not conform to the Corps' Wetland Policy.

The defendant now concedes that no net destruction of wetlands will occur as a result of the plaintiff's proposed project. As a result, no elimination of this valuable link in the aquatic food web will occur. In fact, if a net increase in wetland vegetation occurs, as the plaintiff proposes, additional detritrus will be produced and flushed into the adjacent waterway. The defendant's conclusion that the proposed project did not conform to the Corps' Wetland Policy on this basis therefore is a clear error of judgment.

In summary, the only potential detrimental value to be ascribed to this factor is the loss of approximately five acres of intertidal area. By necessity, however, this loss would be gained in some other area.

## D. WATER QUALITY

The defendant's misconception regarding the actual loss of wetlands at the borrow pit is further manifested in the views he expresses on the water quality factor. The defendant states that wetlands naturally purify water by removing organic and mineral particles and pollutants, and in turn use these substances for their own growth processes. The defendant then reviews the results of a scientific study commissioned by the plaintiff which found that the bor-

row pit has a very high flushing ratio, which means that most of the detritus produced by the wetlands at the side is flushed rapidly out of the pit and into the adjacent ecosystem. The study further indicates that the plaintiff's proposed project would not alter the flushing ratio. Despite this fact, the defendant then states that the capability of the borrow pit to filter nutrients and pollutants, a chemical function, will be restricted by the displacement of 15,000 square feet of wetlands and 11.0 acres of intertidal and subtidal area.

Again, the defendant is in error. Because the 15,000 square feet of wetlands displaced by the project will not be destroyed, merely moved, the chemical function of the wetlands will not be restricted. In fact, if the net square footage of wetlands is increased, as the plaintiff proposes, the chemical function performed by these wetlands will be enhanced. Furthermore, no evidence appears in the record that intertidal and subtidal areas contribute to the chemical function of filtering nutrients and pollutants. The defendant's expert at trial conceded that no significant decline in water quality would occur as a result of the plaintiff's project. Tr. at 269. The plaintiff's expert testified that water quality would be enhanced. In sum, the plaintiff's proposed project will have no unacceptable adverse impact on water quality, and may even enhance water quality.

## E. AESTHETICS

The defendant's view is that no adverse effects are anticipated. The plaintiff, of course, argues that its project will enhance the aesthetics of the pit by removing the pit as a dumping ground for refuse and by the planting of wetlands along six embankments instead of along the current two sides of the pit. The defendant's finding in this regard is not a clear error of judgment.

## F. HISTORICAL VALUE

The defendant's view is that no historical values will be affected by the plaintiff's

project. The defendant's view is correct. The pit has no historical value.

## G.   RECREATION

The defendant's view is that no adverse effects are anticipated. The defendant is correct. The pit has absolutely no recreational value.

## H.   ECONOMY

The defendant's view is that the plaintiff can develop this site into an industrial park for $60,000, whereas an upland site would cost between $200,000 to $350,000. In addition, the development of this site would increase local taxes from $4.00 per year to $16,000 per year. The defendant further states that four businesses will develop the first four phases of the project, and that all of the total five phases will involve construction related businesses. The defendant states that the plaintiff will yield large economic returns from the project.

In sum, the Court finds that the value to the economy will be enhanced by the project, as will the economic benefits to the plaintiff.

## I.   ENERGY NEEDS

The defendant anticipates no significant impact on energy needs. He is correct.

## J.   LAND USE CLASSIFICATION AND COASTAL ZONE MANAGEMENT PLAN

The defendant's view is that the proposed project will not affect land use classification, and that there will be no impact on coastal zone management plans since Virginia has none. The defendant is correct. With regard to actual use of this borrow pit, however, the defendant neglects to state that, in its present condition, the borrow pit has few, if any, uses. Moreover, the Court found at trial, based upon the evidence presented and the defendant's failure to consider this fact in the record, that the borrow pit has no water related uses since it is not navigable or capable of economically being made navigable. The Court found further that no economic use to which the borrow pit may be put exists unless the pit can be filled.

A summary of all of the above factors reveals that, with the possible exception of whatever ecological food value is to be ascribed to the intertidal areas in this borrow pit, the plaintiff's proposed project will have no significant or unacceptable adverse impact on those considerations, and actually will enhance the value of several factors.

After expressing his views on the above factors, the defendant in his report makes what he describes as "other pertinent remarks." The extent to which the defendant intended these remarks to be weighed in the general balancing process is unclear.

In commenting upon the "Extent and Permanence of Beneficial and/or Detrimental Effects", the defendant erroneously states that the proposed project would permanently destroy 15,000 square feet of wetlands. The defendant essentially ignores the extent and permanence of the many benefits of the proposed project, stating only that "the applicant will be able to create an industrial park complex at a cost much less than if he purchased upland property." The defendant fails to indicate whether he considered the extent and permanence of such benefits as the additional jobs created by this project, the increased local tax base, the potentially increased ability of the wetlands to filter nutrients and pollutants, the elimination of a safety hazard and eyesore, and the like. The Court does not purport to indicate that these factors alone require the defendant to grant the plaintiff's permit application, but they must properly be considered and weighed in arriving at a rational decision with regard to this borrow pit.

In other remarks, the defendant states: "the fill material will adversely affect bottom dwelling organisms at the site by smothering immobile forms or forcing mobile forms to migrate. In addition, the discharge of fill materials will result in temporary elevated levels of suspended particulates in the canals surrounding the fill site and in Mill Dam Creek." The record, however, contains no evidence that any bottom dwelling organisms exist at the site, mobile or immobile. The record also

contains no evidence that the smothering of "immobile forms" is of any biological or ecological significance, or that the forced migration of "mobile forms", should such occur, is of any significance. Furthermore, there is no evidence of the extent or significance of "temporary elevated levels of suspended particulates." Certainly, the Virginia State Water Control Board which issued the plaintiff a permit for the proposed project was satisfied that any such activity associated with the project did not pose an unacceptable threat, risk, or danger of harm to the water quality in the area.

The defendant next comments upon "Potential Impacts on Biological Characteristics of the Aquatic Ecosystem", stating that:

> The discharge of fill material can redirect, delay, or stop the reproductive and feeding movements of some species of fish and crustacea, thus preventing their aggregation in accustomed places such as spawning or nursery grounds and potentially leading to reduced population. Reduction of detrital feeding species or other representatives of lower trophic levels can impair the flow of energy from primary consumers to higher trophic levels. The reduction or potential elimination of food chain organism populations decreases the overall productivity of the aquatic ecosystem.

As previously noted, there is no evidence in the record that any fish or crustacea dwell in the borrow pit, or that, even if there were, the proposed fill activity would adversely affect their spawning or nursery grounds or reduce their population.

The defendant then sets forth remarks on the potential impacts of the proposed project on "special aquatic sites." With regard to wetlands, the defendant states that "the discharge of fill material at this site will destroy at least 15,000 square feet of *Spartina alterniflora, Spartina patens, Baccharis halmifolia,* and *Iva frutescens.* The elimination of this wetland system will eliminate the sites capability to assimulate (sic) nutrients and maintain water quality."

Once again, the defendant clearly is in error. No net destruction of wetlands will occur as a result of the plaintiff's proposed fill activity. The wetland system at the site will not be eliminated, and the site's capability to assimilate nutrients and maintain water quality will not be diminished, and may even be enhanced.

With regard to the mudflats at the site, the defendant notes that the project will eliminate the entire function of the mudflats at this site. While this may be true, the defendant does not provide evidence from which a conclusion could be drawn that the elimination of the function of the mudflats *at this site* in conjunction with the plaintiff's proposal would have an unacceptable adverse impact on the environment. Nor does the record contain evidence that the mudflats even perform a significant function *at this site.* If the defendant weighed these factors, he gives no indication as to what weight he gave to these *potential* impacts.

The defendant concludes his report by again erroneously stating that the plaintiff has not proposed any compensation for the 15,000 square feet of wetlands to be filled, and that the project is contrary to the Corps Wetland Policy and the EPA's 404(b) guidelines.

On the basis of the foregoing, the Court is unable to find that the conclusions reached by the defendant were predicated upon a consideration of all relevant factors, or that his opinion was rationally based. In fact, contrary to the defendant's conclusion, the evidence indicates that the plaintiff's project is not contrary to the Corps Wetland Policy and the EPA guidelines because the project will not destroy or degrade any wetlands, and may actually upgrade the wetland system at the borrow pit. The EPA guidelines only indicate fill should not be discharged unless it can be demonstrated that the discharge will not have an unacceptable adverse impact. 40 C.F.R. Section 230.1(c). Thus, by implication, the guidelines themselves recognize that some adverse impacts may be accepta-

ble depending on the circumstances of each case.

The proper decision in a particular case requires a weighing of all the foregoing factors in accord with the established guidelines. The record fails to reflect that the defendant properly engaged in the balancing process. In addition, the factual inaccuracies found in the record are of such a magnitude as to have skewed any rational decision process. The Court concludes, therefore, that the defendant's action in denying the plaintiff's permit application was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## V. UNCONSTITUTIONAL TAKING

The foregoing conclusion does not end the Court's inquiry. The plaintiff argues that, notwithstanding whether the defendant's action was proper or improper, the denial of a permit to 1902 Atlantic Limited in this case amounts to a taking of property without just compensation in derogation of the fifth amendment. The plaintiff therefore requests the Court to issue a declaratory judgment that the denial of a permit to fill the plaintiff's borrow pit in accord with its revised plan was and is a "regulatory taking" of the plaintiff's property without just compensation.

The just compensation clause of the fifth amendment provides: "[N]or shall private property be taken for public use, without just compensation." The Supreme Court has applied this constitutional principle in the context of use restrictions or regulatory "takings" of property and concluded that government regulation can effect a fifth amendment taking. See Agins v. Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The rationale is that "[p]olice power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property." Deltona Corp. v. United States, 657 F.2d 1184, 228 Ct.Cl. 476 (1981), quoting San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting). And, although "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the principle the Court has adopted is that "if regulation goes too far it will be recognized as a taking." Id. at 415, 43 S.Ct. at 160. Deltona Corp. v. United States, 657 F.2d at 1191; Jentgen v. United States, 657 F.2d 1210, 1212, 228 Ct.Cl. 527 (1981); see San Diego Gas & Electric Co. v. San Diego, 450 U.S. at 650, 101 S.Ct. at 1303.

▮▮▮▮ The question whether a particular restriction effects a taking depends largely upon the particular circumstances of the case. See Penn Central Transportation Co. v. New York City, supra. Generally speaking, the just compensation clause preserves governmental power to regulate, subject to the dictates of "justice and fairness." Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). The Supreme Court generally has "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Kaiser Aetna v. United States, 444 U.S. at 175, 100 S.Ct. at 390, quoting Penn Central Transportation Co. v. New York City, 438 U.S. at 124, 98 S.Ct. at 2659. Rather, the Court has examined the "taking" question by engaging in essentially ad hoc, factual inquiries. These inquiries have identified several significant factors, including the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action. Id.

▮▮ Recently, the Court set forth the following standard: "The application of a

general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, (citation omitted) or denies a[n] owner economically viable use of his land." *Agins v. City of Tiburon*, 447 U.S. at 260, 100 S.Ct. at 2141, *citing Penn Central Transportation Co. v. New York City*, 438 U.S. at 138 n. 36, 98 S.Ct. at 2666 n. 36. *Accord Deltona Corp. v. United States, supra; Jentgen v. United States, supra.* The defendant argues that the proper standard for determining whether a taking has occurred is whether all "reasonable beneficial" uses of the property have been destroyed. The argument is academic, however, because this Court, under either standard, cannot imagine a more compelling instance for concluding that a taking has occurred.

■ The testimony at trial indicates beyond peradventure that the action of denying a permit to fill the borrow pit has rendered the pit commercially worthless, and the Court so finds. Standing alone, the almost total diminution in value of the property may not be enough to establish a "taking", *see Penn Central Transportation Co. v. New York City*, 438 U.S. at 131, 98 S.Ct. at 2662, but the near total diminution in value is not the only effect the defendant's action has had on the plaintiff's property. Without a doubt, the plaintiff also has been denied all viable economic use of the property. The Court finds as a fact that, without a permit to fill the borrow pit, no economically viable use can be made of the pit. For instance, even if dredged, the pit is not large enough for a marina, and would be valueless as a marina in any event because no boats could navigate up the adjoining creek and through the culverts under which the creek runs. The pit also has no viable commercial fishing and hunting, or recreational use.

The Court further finds as a fact, based on the evidence adduced at trial including the Court's own view of the borrow pit, that the defendant's action has precluded

any reasonable beneficial use of the borrow pit. The testimony offered by the defendant to the contrary is so inherently incredible, and so unsupported by any objective evidence, as to be unworthy of belief. The Court can conceive of no reasonable beneficial use to which the plaintiff can put this borrow pit in its current state.[19] This Court, in "justice and fairness", therefore holds that a taking of the plaintiff's property has occurred.

■ In so holding, this Court necessarily rejects the defendant's argument that the alleged dominant interest of the United States in the waters of the borrow pit (the so-called navigational servitude) precludes finding that a taking has occurred. Before the federal navigational servitude can be invoked over a body of water, that body of water must have some connection to navigation. *Kaiser Aetna v. United States, supra.* As this Court noted previously, the plaintiff's borrow pit is not navigable in fact, and is incapable of use as a continuous highway for the purpose of navigation in interstate commerce. Moreover, the Supreme Court's opinion in *Kaiser Aetna* clearly establishes that the mere ebb and flow of the tide is an insufficient basis for "the Government to invoke the 'navigational servitude' to avoid payment of just compensation irrespective of the private interests at stake". *Id.* 444 U.S. at 179 n. 10, 100 S.Ct. at 392 n. 10. The borrow pit consequently "is not the sort of 'great navigable stream' that [the Supreme Court] has previously recognized as being [incapable] of private ownership." *Id.*

The facts attendant to this case are even more compelling than the facts before the Supreme Court in *Kaiser Aetna* when it rejected the same argument the defendant now makes. If Kuapa Pond in *Kaiser Aetna* was not the sort of waterbody over which the government could invoke the navigational servitude in order to preclude the Court from holding a taking had oc-

---

**19.** The factual situation in this case is so different from typical wetlands cases as to make it distinguishable on its facts from those cases, including the unpublished decision of the Unit- ed States Magistrate for the Eastern District of North Carolina upon which the defendant appears heavily to rely on this point—*Smithwick v. Alexander*, 17 ERC 2126 at 2131 (1981).

curred, the plaintiff's borrow pit also is not. As was true of the attempt of the defendant in *Kaiser Aetna*, the attempt of the defendant herein to regulate the use of the plaintiff's borrow pit "goes so far beyond ordinary regulation or improvement for navigation as to amount to a taking under the logic of *Pennsylvania Coal* ...." *Id.* at 178, 100 S.Ct. at 392.

Finally, in holding that a taking has occurred in this instance, this Court also rejects the argument of the defendant that the Court is divested of jurisdiction to grant the plaintiff's request for a declaratory judgment because the Tucker Act, 28 U.S.C. Section 1491 vested jurisdiction exclusively in the Court of Claims. In the opinion of the Court, the Administrative Procedure Act (APA), by its terms, requires this Court to reach the issue of whether a taking has occurred. Section 706 of Title 5 of the United States Code requires that the reviewing court "shall decide all relevant questions of law ...," and "shall ... hold unlawful and set aside agency action, findings and conclusions found to be— ... (B) contrary to constitutional right, power, privilege, or immunity," or "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...." *Id.* The taking issue is highly relevant to this case. Although the APA may not be an express conferral of jurisdiction, Congress obviously intended the district courts to exercise authority to set aside agency action if the court found such action to be contrary to a constitutional right. Moreover, the defendant had no statutory authority, jurisdiction, or right, to "take" the plaintiff's property, and he claims none. Under the APA, therefore, this Court certainly has the authority to issue a declaratory judgment that the defendant's action has exceeded the limits imposed by his own statutory authority and the Constitution.

Because the plaintiff has not requested any money damages, and because this Court is not holding that the defendant is liable for any monetary damages, the defendant's argument that the Court of Claims has exclusive jurisdiction to *hear* the taking question as opposed to *award*

compensation must fail. In fact, in regulatory "taking" cases such as the instant case, where the owner remains in physical possession of property whose use has been destroyed by regulatory action, the remedy awarded has *not* been monetary damages for the diminution in value, but a declaration of the invalidity of the action. *Pamel Corp. v. Puerto Rico Highway Authority,* 621 F.2d 33, 35 (1st Cir.1980). The Supreme Court apparently has yet to hold that a monetary remedy is available to a landowner whose property has been "taken" by regulatory action. *See San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. at 623, 101 S.Ct. at 1289. *Cf. Agins v. Tiburon, supra.* Because no issue of money damages or liability for monetary damages is presented in the instant case, the Tucker Act does not divest this Court of jurisdiction to hear the plaintiff's regulatory "taking" claim. At least one other federal court has reached the same conclusion, refusing to dismiss a claim against a federal agency for injunctive relief which had been coupled with a claim for monetary damages. Holding that the Court of Claims had exclusive jurisdiction to hear the claim for monetary damages, the court dismissed that claim but retained the claim for injunctive relief. *Parkview Corp. v. Department of Army,* 490 F.Supp. 1278 (E.D.Wis.1980). The court, relying on the case of *Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 607–08 n. 6, 98 S.Ct. 2002, 2005 n. 6, 56 L.Ed.2d 570 (1978) stated that 28 U.S.C. Section 1331(a) provides a federal district court with jurisdiction over claims against a federal agency for injunctive relief. *Parkview Corp. v. Department of Army,* 490 F.Supp. at 1281.

Furthermore, the Court of Claims has held that its jurisdiction "is confined to money judgments in suits against the United States, and that if the relief sought is against others [sic] than the United States, it is not within the jurisdiction of this court ... Accordingly, the suit against [the director of a federal agency] must be dismissed as beyond the jurisdiction of this court." *Bogart v. United States,* 531 F.2d

988–991, 209 Ct.Cl. 208 (1976). The *Bogart* holding contradicts the defendant's view that the Court of Claims has jurisdiction to hear a suit against him, whether for money damages or for injunctive relief.

Accordingly, this Court holds that it is not divested of jurisdiction to hear the plaintiff's regulatory "taking" claim.

## VI. CONCLUSION

The defendant's conduct was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. In addition, the actions of the defendant constituted a regulatory "taking" in derogation of constitutional right, and were in excess of his statutory authority. The defendant is therefore required to reconsider the plaintiff's permit application in accordance with the views stated herein. Alternatively, if the defendant desires the waters of the borrow pit to be dedicated to public use, he shall take such action as will cause the government to invoke its eminent domain power and pay the plaintiff just compensation.

## ORDER

In accordance with the opinion this day filed, it is hereby ORDERED that this matter be REMANDED and returned to the District Engineer, Norfolk Division, U.S. Army Corps of Engineers, and that the said District Engineer take action to reconsider the permit application of the plaintiff in accordance with the views expressed in said opinion or in the alternative, that the District Engineer forthwith commence proceedings for condemnation of the property upon which the plaintiff sought a permit to fill under the Eminent Domain statutes of the United States of America for its use and benefit if and only if the said District Engineer presently has funds which may be utilized for said purposes.

IT IS SO ORDERED.