**CHARTER TOWNSHIP OF VAN BUREN, Plaintiff,**

**v.**

**Valdas ADAMKUS, in his capacity as Regional Administrator for the Environmental Protection Agency, Region 5, Defendant,**

**and**

**Wayne Disposal, Inc., a Michigan corporation, Intervenor.**

No. 97–71657.

United States District Court,
E.D. Michigan,
Southern Division.

May 2, 1997.

Saulius K. Mikalonis, Southfield, MI, for Plaintiff.

Mark R. Werder, Detroit, MI, Peter A. Caplan, Asst. U.S. Atty., for Defendant.

### MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR STAY

EDMUNDS, District Judge.

### Introduction

This case concerns the disposal of polychlorinated biphenyls, toxic substances formerly used in various industrial applications. Congress has prohibited the manufacture, processing, or distribution of PCBs since 1976. Unfortunately, however, a significant volume of wastes containing PCBs already existed by the mid–1970s. The Environmental Protection Agency has been charged with the responsibility for disposing of those substances.[1]

On April 14, 1997, after twenty-one months of review and consideration, the EPA granted a permit allowing Wayne Disposal, Inc. to dispose of wastes containing PCBs in non-liquid form and in concentrations in excess of 50 parts per million at WDI's facility in Van Buren Township. The Township has brought suit in federal court, contending that the EPA's issuance of the permit may be stayed under a portion of the Administrative Procedures Act,[2] which authorizes the courts to set aside agency actions that are "arbi-

trary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. For the reasons set forth herein, this Court denies the motion to stay brought by Plaintiff.[3]

### I. Facts

Congress enacted the Toxic Substances Control Act in 1976:

> in an effort to provide a comprehensive framework for regulating toxic chemicals. Although prior environmental legislation touched on certain aspects of toxic substance control, Congress found that federal laws were "fragmented and inadequate," and that this piecemeal approach left "conspicuous gaps ... in the protections provided by such laws."

*Environmental Defense Fund v. Thomas*, 657 F.Supp. 302, 304 (D.D.C.1987), *aff'd*, 909 F.2d 1497 (D.C.Cir.1990). One of those "conspicuous gaps" was plugged by an express statutory prohibition on the manufacturing, processing, or distribution of PCBs, and a corresponding instruction to EPA to "prescribe methods for disposal of polychlorinated biphenyls." 15 U.S.C. §§ 2605(e)(2)(A), 2605(e)(1)(A). The regulations implementing the statutory command are found at 40 C.F.R. § 761.60–79 (subpart D), and it is application of one of those regulations (section 761.75) that is at issue in this suit.

The Toxic Substances Control Act, 15 U.S.C. §§ 2601–2692 (1994), and regulations promulgated under it make clear that PCBs are dangerous substances. *See* 40 C.F.R. § 761.20 (1997) (" [T]he Administrator hereby finds ... that the manufacture, processing, and distribution in commerce of PCBs at concentrations of 50 ppm or greater and PCB Items with PCB concentration of 50 ppm or greater present an unreasonable risk of injury to health within the United States.")

---

1. Toxic Substances Control Act ("TSCA"), Pub.L. No. 94–469, 90 Stat.2003 (1976) (codified as amended at 15 U.S.C. § 2601–2629 (1994)).

2. Pub.L. No. 79–404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §§ 551–59, 701–06, 3105, 3344 (1994)).

3. Plaintiff filed a verified petition for review on April 16, 1997. On April 18, 1997, by consent of the parties, the Court temporarily stayed the ef-

fectiveness of the permit granted to Wayne Disposal. Plaintiff filed an amended petition for review on April 22, 1997, and the Court granted Wayne Disposal's motion to intervene on April 23. Additional briefs were filed by the parties prior to oral argument on the motion to stay, which was heard April 29. Following oral argument, the Court extended the temporary stay to May 2.

The manufacture of PCBs is now illegal. 15 U.S.C. § 2605(e)(3). PCBs are non-naturally occurring oily liquids used in coolants, insulating materials, and lubricants in fluorescent lighting fixtures, transformers, capacitors, and hydraulic fluids. According to the Plaintiff, the detrimental effects of PCB exposure include skin rashes, liver damage, kidney damage, thyroid gland injuries, and anemia.

Despite their hazardous side effects, PCBs are found in uncontrolled environments at a number of industrial sites across the state and country. As these sites are cleaned, adequate controlled storage facilities are necessary to prevent public harm. According to the EPA, "[t]he landfill will be accepting PCB wastes in order to provide a remediation mechanism for PCB contaminants that unfortunately already found their way into the environment. Disposal in a TSCA-approved landfill is one of the best alternatives for isolating these wastes from the environment." Administrative Record ("A.R.") at 3082, Comment 40.

WDI's disposal facility has been operated since 1980 on approximately 470 acres of property north of the North I–94 Service Drive, in Belleville, Michigan. It is approximately 1,500 feet from condominiums and other residences and is approximately 2,000 feet from Belleville Lake. WDI's landfill is the only commercial landfill in Michigan licensed to dispose of hazardous wastes under the federal Resources Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k (1994), and Part 111 of the Michigan Natural Resources and Environmental Protection Act, Mich.Comp. Laws Ann. § 324.11101 to 324.11152 (West 1992).

The permit challenged by Plaintiff was issued after almost two years of consideration. On May 10, 1995, Ford and the Environmental Quality Co., doing business as WDI, applied to the EPA for approval under the Toxic Substances Control Act ("TSCA"), Pub.L. No. 94–469, 90 Stat.2003 (1976) (codified as amended at 15 U.S.C. § 2601–2629 (1994)), to dispose of hazardous wastes containing concentrations of PCBs in excess of 50 ppm. As part of its investigation, the EPA published notice of the application, published a draft of the permit, allowed four months for public comment on the draft, and conducted public hearings in Van Buren. The EPA also took the additional step of convening a peer review panel of scientists and independent experts to review the application, supplementary information, and EPA evaluation of the site. The panel, after review of the research and data compiled by the parties, found that the site exceeded all requirements for a TSCA permit. To respond to the comments and written objections to the draft permit, the EPA and Michigan's Department of Environmental Quality ("MDEQ")[4] prepared a 238 page document addressing the concerns of local residents.

On April 14, 1997, the Regional Administrator issued the TSCA approval, authorizing WDI to dispose of non-liquid wastes containing PCBs at concentrations of 50 ppm or more at Cell VI of the WDI facility. Cell VI is one of nine waste units operated by WDI in Belleville. It is the only active cell at the facility and currently is used for disposal of virtually every hazardous waste regulated under RCRA and Part 111. Cell VI is in a thick, relatively impermeable large-area clay pan. Underneath the Cell liner is at least ten feet of clay with the required permeability of less than $1 \times 10-7$ cm/sec. The Cell also contains an eighty mil high density polyethylene synthetic membrane primary liner and an eighty mil high density polyethylene synthetic membrane secondary liner, synthetic membranes separated by sixty inches of recompacted clay, a primary and secondary leachate collection system, a relatively impermeable clay dike surrounding Cell VI, a second relatively impermeable clay dike surrounding all of WDI's cells, and a drain system on the northern boundary rerouting shallow water around all the cells. A.R. at 5297–98.

The EPA found "that the Landfill, when operated in accordance with TSCA, the PCB regulations and the conditions of this Approval, will not present an unreasonable risk

4. MDEQ is responsible for the decision to issue a hazardous waste operating license under Part 111. This license, granted at approximately the same time as the TSCA permit, reauthorized the hazardous waste operations at WDI.

of injury to health or the environment." A.R. at 5287. The permit is effective for five years, but may be modified or terminated if the EPA finds reason to believe that the facility poses an unreasonable risk of injury to the public or the environment. A.R. at 5288. The permit allows disposal of 1,435,-000 cubic yards of PCB wastes at WDI's Cell VI. The facility will be the first in Michigan permitted to accept PCB wastes. The closest alternative facility is located in Buffalo, New York.

## II. Standard for Motion to Stay

Jurisdiction in this Court is proper under the Administrative Procedures Act, Pub.L. No. 79–404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §§ 551–59, 701–06, 3105, 3344 (1994)). To the extent necessary to prevent irreparable injury, this Court "may issue all necessary and appropriate process to postpone the effective date of an agency action...." 5 U.S.C. § 705. In interpreting this section, the Sixth Circuit has held that a motion for a § 705 stay should be judged by the same standard as a motion for a preliminary injunction. *Ohio v. Nuclear Regulatory Commission*, 812 F.2d 288, 290 (6th Cir.1987).

This Court must consider four factors in deciding whether to issue a preliminary injunction:

1. whether the movant has shown a strong or substantial likelihood of success on the merits;

2. whether the movant has demonstrated irreparable injury;

3. whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. whether the public interest is served by the issuance of an injunction.

*Parker v. U.S. Dept. of Agric.*, 879 F.2d 1362, 1367 (6th Cir.1989). The foregoing factors should balanced. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985). Where the three factors other than the likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary injunction if the merits present a sufficiently serious question to jus-

tify a further investigation. *Id.* at 1230. Alternatively, the court may also issue a preliminary injunction if the movant "at least shows serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir.1985) (citations omitted).

## III. Analysis

### A. Likelihood of Success on the Merits

### 1. Standard of Review of EPA Decision

This Court may not conduct a de novo review of the EPA's decision. Instead, this Court's review is limited by 5 U.S.C. § 706, which requires this Court to "determine whether the EPA followed the proper lawful procedures and acted within its statutory authority." *National Steel Corp., Great Lakes Steel v. Gorsuch*, 700 F.2d 314, 320 (6th Cir.1983). The statute states:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\*    \*    \*    \*    \*    \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to a trial de novo by a reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

The Supreme Court has held that a district court may not substitute its judgment for the judgment of the agency. Instead, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); *see also Oakland County Bd. of Comm'rs v. Department of Labor,* 853 F.2d 439, 442 (6th Cir.1988) ("Generally, a court will find an abuse of discretion only if there is no evidence to support the [Secretary's] decision, or if [it] is based on an improper understanding of the law.") (citations omitted).

This Court's task is made more difficult by the technical nature of the record. However, the Sixth Circuit has stated:

[i]n reviewing the aspects of [a] dispute pertaining directly to the EPA's evaluation of the technical data, ... courts are well-advised to study the record carefully, but to "look at the [agency's] decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality."

*Michigan v. Thomas,* 805 F.2d 176, 182 (6th Cir.1986) (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 905 (5th Cir.1983)); *see also Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) (when examining certain scientific determinations, "a reviewing court must generally be at its most deferential").

The parties stipulated that the complete EPA record, comprising approximately 10,000 pages, did not need to be filed with this Court. Instead, a certified index of the record was filed and copies of the record were made available to all parties. Those portions that the parties relied upon in their briefs were submitted to and reviewed by this Court.

## 2. Regulations for Disposal of PCB Waste

In the TSCA, Congress established a regulatory framework for the handling and disposal of certain highly hazardous toxic wastes. 15 U.S.C. § 2609(e) delegated authority to the EPA to establish rules for the handling and disposal of PCBs. Those regulations, found at 40 C.F.R. §§ 761.1 to 761.218 (1996), contain detailed requirements for the manufacturing, shipment, use, storage, and disposal of PCBs.

The most important section for purposes of the present matter is 40 C.F.R. § 761.75, which regulates chemical waste landfills used to dispose of PCBs. Before a landfill is permitted by the regulations to dispose of PCBs, the Regional Administrator must certify that the landfill complies with the requirements of 40 C.F.R. § 761.75(b), unless the landfill receives a waiver under § 761.75(c)(4). The nine requirements under 40 C.F.R. § 761.75(b) are summarized as follows:

(1) Soils. The landfill must be located in thick, relatively impermeable formations, such as large-area clay pans.;

(2) Synthetic Membrane Liners. Synthetic membrane liners must be used when the Regional Administrator determines the hydrologic or geologic conditions require one in order to meet soil permeability requirements;

(3) Hydrologic Conditions. The bottom of the landfill shall be above the historic high groundwater table. Floodplains, shorelands, and groundwater recharge areas shall be avoided. There shall be no hydraulic connection between the site and standing or flowing surface water. The site shall have monitoring wells and leachate collection. The bottom of the landfill liner system or natural in-place soil barrier shall be at least fifty feet from the historical high water table;

(4) Flood protection. The landfill must provide structures for diverting all surface

water runoff from a 24–hour, 25–year storm.

(5) Topography. The landfill site shall be located in an area of low to moderate relief to minimize erosion and to help prevent landslides or slumping;

(6) Monitoring Systems. The ground and surface water from the disposal site area must be sampled before, during, and after storage of PCBs. The water sampling must be analyzed for PCBs, ph, specific conductance, and chlorinated organics;

(7) Leachate[5] Collection. A leachate collection monitoring system must be installed above the landfill. The system must be monitored monthly for the chemical composition of leachate. Leachate must be treated to acceptable limits for storage within the landfill or disposed of in accordance with other laws;

(8) Chemical waste landfill operations. PCBs shall be placed in a manner that will prevent damage to containers or articles. PCB waste must be segregated from other incompatible waste at the landfill. The landfill must submit an operational plan to the Regional Administrator. This plan must include detailed explanations of the procedures to be used for recordkeeping, surface water handling, excavation and backfilling waste segregation burial coordinates, vehicle and equipment movement, use of roadways, leachate collection systems, sampling and monitoring procedures, emergency measures, and safety measures. Ignitable wastes shall not be permitted. Records must be maintained for the landfill.

(9) Supporting Facilities. A fence shall be built to prevent unauthorized access. Roads shall be maintained to allow proper operation of the site. The site shall be operated and maintained in a manner to prevent safety problems or hazardous conditions from spilled liquids and windblown materials.

An EPA Regional Administrator may issue a waiver of one or more requirements if he or she finds nonetheless that "the landfill will not present an unreasonable risk of injury to health or the environment from PCBs." 40 C.F.R. § 761.75(c)(4). The Regional Administrator must specify any waiver in writing as part of the permit.

### 3. Plaintiff's Criticism of the EPA's Action

Plaintiff argues that the Regional Administrator's decision was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, submitting a detailed list of actions which are allegedly improper. *See* Amended Petition for Review at 18 a-h and Exhibit F. To grant a stay in this matter, the Court must find that Plaintiff is likely to succeed on the merits of its claim. The Court will consider each of Plaintiff's claims in turn.[6]

#### a. Decision Making Preceded Evaluation of the Site

■ Plaintiff contends that the EPA decided from the outset to issue the permit to WDI and built an administrative record to support its decision. This assertion is based primarily on two pieces of evidence. The first is a statement made during a meeting in November of 1995, recorded in handwritten notes. An EPA attendee named Karl Brenner stated "the money issue carries most weight." Amended Petition for Review at Ex. A, Notes from Nov. 30, 1995 meeting. This one statement, taken out of over 10,000 pages of documents, fails to demonstrate that the Regional Administrator made a predetermination on the merits of the permit application. Although Plaintiff contends that the remark was made in support of Ford Motor Company, which was anxious to obtain a TSCA permit, the administrative record does not establish the context of the quotation or the position of the speaker, and there is no way to infer the statement's relevance to the permit application process.

---

**5.** Leachate is the liquid that has percolated through soil or other medium. Webster's New Int'l. Dictionary 1282 (3d ed.1986).

**6.** Several other possible issues were listed in an appendix to Plaintiff's amended petition for re-

view. See Amended Petition at Ex. F. These issues were not briefed for the Court, and therefore, Plaintiff has not shown any likelihood of success on them.

The second document relied upon is a letter from Russell Hardin, Director of MDEQ to the EPA. Amended Petition for Review at Ex. B. In the letter, Harding urges the EPA to approve WDI and Ford's application for the permit, "[a]ssuming the Wayne Disposal Inc. facility passes technical muster under the TSCA as well as our hazardous waste statute." The letter surely demonstrates that the MDEQ was interested in obtaining safe and controlled disposal facilities for PCBs in Michigan. Because the letter is from MDEQ, however, and not the EPA, it does not support Plaintiff's position that the EPA made any pre-determination on the TSCA permit.

Although Plaintiff claims that EPA's predetermination of the permit approval was motivation to subvert the decision-making process in an arbitrary and capricious manner, the Administrative Record does not support Plaintiff's contention that such motive existed. Moreover, even if the EPA was inclined from the outset to approve the permit application, this Court may not vacate its decision unless the EPA acted arbitrarily and capriciously by failing to consider relevant data, considering irrelevant data, or ignoring its regulations. If the EPA's decision is a rational and reasonable interpretation of proper data, this Court must uphold it.[7] *Volpe,* 401 U.S. at 416, 91 S.Ct. at 824.

### b. Groundwater Recharge Zone

■ Plaintiff contends that the EPA ignored evidence that the site is located in a groundwater recharge zone. 40 C.F.R. § 761.75(b)(3) provides, in part, that "[f]loodplains, shorelands, and groundwater recharge areas shall be avoided." The term "groundwater recharge zone" is not defined in the regulations. According to a submission from the Plaintiff, a groundwater recharge zone is a region of soil, approximately one to ten feet below the earth's surface, where water passes between two different soil layers. The top "unsaturated" zone is comprised of soil, water, and air. The bottom "saturated" zone (or "aquifer") is comprised only of soil and water. Water from the unsaturated zone may pass into the saturated zone. When this happens, it is said to be "recharging" the saturated zone.

Plaintiff bases its argument that the site is in a recharge zone on a statement in WDI's application for the permit and on tests that WDI performed on the site. Plaintiff also maintains that the EPA has disregarded recharge occurring at a higher level aquifer surrounding WDI's complex and has redefined the relevant aquifer improperly to include only a lower level aquifer.

In its application, WDI described and analyzed the information from a study of the 56 square miles surrounding the proposed landfill. WDI acknowledged that this site was in a recharge zone, but went on to state that "[t]he cohesive glacial till underlying the surface sand and the landfill cells constitutes a confining layer, which effectively restricts recharge to the sand aquifer." A.R. at 3516. Because the data referred to by Plaintiff covers a far broader area than the proposed landfill, it is difficult to evaluate how much of it is relevant to this permit.

With respect to the higher level aquifer that Plaintiff contends was improperly ignored, the EPA apparently determined, based on the RMT report, that the landfill was built in a manner that removed that entire level of soil and replaced it with layers of clay dikes. "In those portions of the landfill already constructed, the deltaic sand has been removed. Cutoff dikes, composed of silty clay, have been constructed around each Master Cell within the landfill." A.R. at 3777. Further, even if that level had not been replaced, the RMT report found that due to the thinness of the layer and seasonal fluctuations, "the sand is not used as an aquifer in the area near the landfill, as is verified by water well records." A.R. at 3514. Given the information provided by the

---

7. Plaintiff argues, based on *1902 Atlantic Ltd. v. Hudson,* 574 F.Supp. 1381, 1397 (E.D.Va.1983), that if an agency makes its decision before it has considered all relevant data, it has acted arbitrarily and capriciously. However, in that case the court also noted that whether or not the agency had worked to support its pre-determined outcome, "the [agency's] decision was clearly in error and was not rationally based." *Id.* The court stated that the defendant "failed to properly consider all relevant factors, that several irrelevant factors were improperly considered, and that he failed to engage in the proper balancing test." *Id.*

RMT report, the Court is not persuaded that the EPA acted arbitrarily and capriciously by defining the upper aquifer in the manner that it did. The aquifer that Plaintiff contends should have been considered does not exist under any of the cells at WDI's facility, and therefore, has no direct relevance to the determination of whether the landfill is in a groundwater recharge zone.

Plaintiff also relies on a 1986 report which indicates the presence of tritium in groundwater in two monitoring wells near Cell VI. Tritium is a hydrogen isotope that is found in water that has entered the ground since 1953, the time that hydrogen bombs were detonated. The data from those two wells was inconsistent with the data from several other wells sampled during the same study. The report, prepared several years before WDI applied for its TSCA permit, concluded that an unexplained error resulted in the detection of tritium in the groundwater. "The IRI report lists several possible reasons including fractured till, rapid diffusion of tritium through the till, leaking monitoring wells, and sample contamination." A.R. at 4447-48. The report concluded by finding that WDI's cells had not had any impact on the groundwater. "The tritium and oxygen-18 study performed by the Industrial Research Institute (IRI) of the University of Windsor concluded that, based on the oxygen-18 data, the groundwater from the wells had not been obviously affected by leachate. The tritium data for the upgradient wells and most of the downgradient wells also supported this conclusion." A.R. at 4447. The EPA and peer review panel considered the information in this IRI report. After considering all available tritium data, however, both found that the site was not in a recharge zone.

Tritium isotope measurements in groundwater from the lower sand aquifer beneath the landfill are extremely low and significantly different from water collected above the clay layer. The low tritium concentrations in the groundwater are consistent with the water being relatively old (approximately 100 years or older). If significant hydrologic connection existed between the landfill and the lower sand aquifer, or had this area been a recharge zone, higher tritium concentrations would be expected, reflecting a much younger age for the groundwater.

Review Panel Report (Jan. 23, 1997) at 4–5. A.R. at 8660–61. Although the data from two of the nine wells evaluated in 1986 was inconsistent with the EPA's ultimate conclusion. it is clear from the A.R. that the EPA was careful to consider and weigh all the existing data, finally concluding that far more evidence supported the finding that the site was not in a groundwater recharge zone.

### c. Hydraulic Connection to Belleville Lake & EPA's Definition of "Site"

■ Plaintiff claims that the EPA improperly determined that there is no connection between the site and Belleville Lake. 40 C.F.R. § 761.75(b)(3) requires that "[t]here shall be no hydraulic connection between the site and standing or flowing surface water." Plaintiff contends that the EPA improperly defined the term "site" in order to reach the conclusion that there is no hydraulic connection. The EPA defined "site" to encompass only Cell VI, rather than the broad property boundaries. Plaintiff contends that the EPA disregarded its own definition of "site" from TSCA rules passed in 1982. "EPA uses the term site to mean a contiguous property unit. Property divided by a public right-of-way is considered one site." 47 Fed.Reg. 46980, 46987 (Oct. 21, 1982). Plaintiff maintains that the EPA has acted arbitrarily and capriciously by defining the site in this case as only Cell VI and that a recent EPA proposal to clarify the definition of the terms site, facility, and unit within 40 C.F.R. Part 761 supports its argument that the EPA acted impermissibly. The Township also points to some maps and exhibits submitted with WDI's application that describe the "site" as the entire WDI property, not just Cell VI.

The definitions applicable to Part 761 of the C.F.R. are found in 40 C.F.R. § 761.3, and do not include a definition of "site." The rule that Plaintiff cites, 47 Fed.Reg. at 46987, is not applicable to the regulations at issue. It provides a definition of site for rules regarding the generation of PCBs in closed manufacturing processes and does not apply

to the storage and disposal of PCBs in facilities like WDI. Nor is the recent proposed rule determinative. The EPA concedes that it sometimes uses terms inconsistently, and the proposed rule attempts to clear up some of the inconsistencies. Even the new proposal, however, does not define "site." Rather, the proposed definition differentiates between a "facility" and a "unit." The former is intended to cover an entire geographic unit, i.e. Plaintiff's definition of a site. The latter is intended to cover a small disposal area, i.e. the EPA's definition of a site.

Because there is no definition of "site" in the statute or regulations, this Court must defer to the EPA's interpretation. Plaintiff argues that "the least amount of deference is due in interpretation of language which parallel [sic] the judicial function of giving meaning to words used in governing statutes and regulations." Plaintiff's Supplemental Brief at 9, citing *Montana Power Co. v. EPA,* 429 F.Supp. 683, 695 (D.Mont.1977). As the Ninth Circuit noted on appeal in *Montana Power,* however, "the standard set forth in *Tallman* [does not allow] the courts any broader grant of review when an agency determination 'concern[s] the meanings of a statutory term' as long as the agency does not exceed its own statutory authorization." *Montana Power Co. v. EPA,* 608 F.2d 334, 345 (9th Cir.1979); *see also Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386–87, 129 L.Ed.2d 405 (1994) ("The agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.") The Supreme Court also held that such deference is particularly appropriate where "the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Id.*

The Regional Director's definition of "site" was not plainly erroneous or inconsistent with the regulation. The Regional Director,

in response to comments received from the public, defined "site" as follows:

> The definition of a site does not include the surrounding acreage. Although EPA considers the site's surrounding geology and hydrology, conformance with 40 C.F.R. § 761.75(b)(3) is based on the *landfill's* location. For Master Cell VI, the clay pan provides sufficient isolation to satisfy the requirement for no hydraulic connection between the site and standing or flowing water.

A.R. at 3123–24 (emphasis added). The EPA's determination that the term "site" in § 761.75(b)(3) meant "landfill" was a reasonable interpretation of the regulation. Section 761.75(b) states that the subsection describes that requirements for "chemical waste landfills." Sections 761.75(b)(1) and (2) use the term "landfill site." It was reasonable for the EPA to use the context of the preceding subsections and interpret the term "site" in § 761.75(b)(3) to mean "landfill site," as it was used earlier. This interpretation is also consistent with the overall goal of the regulation to prevent PCBs from reaching groundwater. It would be unnecessary to require an entire piece of contiguous property meet the requirements of § 761.75 if the PCBs are only going to be stored in one portion of it.[8]

The EPA's interpretation of the term "site" in the context of this complex environmental regulation is entitled to great deference. Plaintiff has not demonstrated a substantial likelihood that it can prove that the EPA's interpretation was plainly erroneous or inconsistent with the regulation.

### d. Peer Review Panel Disregarded Information

The Plaintiff also asserts that the peer review panel selectively disregarded and re-evaluated information which was inconsistent with its predetermined outcome. As a preliminary matter, nothing in the TSCA or regulations under it require the EPA to convene a peer review panel. The

---

8. Accepting Plaintiff's definition of "site" could lead to illogical results. If "site" is interpreted broadly to mean the borders of a piece of property, there would be more of a chance that it would have a hydraulic connection to standing water.

This, in turn, would encourage waste disposal companies to locate their sites on small pieces of property instead of on small, isolated portions of larger pieces of property.

establishment of this panel was an extraordinary step that the EPA took to ensure that WDI complied with all applicable regulations.

The panel, an independent group of scientists with no stake in the outcome, found that the WDI site met or exceeded all applicable regulations. Further, Plaintiff's assertion that the panel disregarded information is not supported by the evidence. The panel stated in its report that it reviewed WDI's application, five volumes of supplemental information regarding the application, internal EPA reports, and groundwater evaluation results. The panel reached a consensus that the site exceeded all requirements under the TSCA regulations. Although it noted that "further documentation supporting the conclusions of the peer review panel could be obtained through additional hydrologic studies," the panel did not recommend that such additional studies were necessary. The Plaintiff has not proven that the panel selectively disregarded or re-evaluated any information. Therefore, the Court finds that the Plaintiff has not proven a substantial likelihood of success on the merits on this issue.

### e. Consideration of WDI's Compliance History

■ Plaintiff claims that the EPA acted arbitrarily and capriciously by disregarding a "long history of noncompliance with environmental standards on the part of EQ." Plaintiff's Supplemental Brief at 13. "EQ" is the Environmental Quality Co., the corporate parent of WDI. The evidence indicates that in the past several years, EQ was occasionally found to be out of compliance with environmental regulations.

Although the regulations do not require the EPA to consider compliance history as a factor in granting the permit, the record indicates that the EPA did consider it. In the response to comments, the EPA addressed the issue as follows:

> EPA and MDEQ expect a hazardous waste facility to comply with the conditions of its operating license and permits and other hazardous waste requirements. However, the hazardous waste management regulations are very complex and constantly changing. For these reasons, a facility may experience some level of non-compli-

ance. In evaluating the significance of this non-compliance, EPA and MDEQ considered the nature of violation and whether the facility is responsive to correcting the violation. While WDI has experienced some non-compliance, none of its violations have posed an imminent threat to human health or the environment. WDI has been responsive in addressing violations to MDEQ's satisfaction.

A.R. at 3028. Moreover, during more than 20 years of waste disposal at EQ's facility, including 17 years of disposal of hazardous waste, the facility has not impacted the groundwater, and there is no evidence of releases of contaminants from the facility during its entire existence. A.R. at 3211, 3213–3214.

In response to concerns about WDI's compliance with environmental regulations, the EPA and MDEQ hired a person to work at the site and monitor compliance, even though this precaution is not required by the TSCA or applicable regulations.

Plaintiff has not proven a substantial likelihood of success on this issue. The EPA has considered WDI's compliance history and found it to be reasonable and acceptable under the circumstances. This conclusion, coupled with the precaution of requiring an on-site compliance monitor, cannot be considered arbitrary and capricious.

### f. EPA's Failure to Respond to Comments

■ Plaintiff also contends that the EPA has not responded adequately to a number of comments raised by local residents during the comment period on the permit. *See* Amended Petition for Review at ¶ 18 & Exhibit F. This Court's review of the Response to Comments, which comprises 238 pages of the administrative record, establishes that the EPA made a good faith effort to respond as fully as possible to public comments. Even if this were not the case, however, Plaintiff cannot rely on an inadequate response to comments to establish arbitrary and capricious action. Nothing in the TSCA or regulations requires any public comment period when a company applies for a permit. Nor is there a requirement that the EPA

respond to all concerns raised by local residents. Not only does the administrative record contradict Plaintiff's contention on this issue, nothing in the statute or regulations supports its legal theory that the EPA acted arbitrarily and capriciously.

### 4. Conclusion on Likelihood of Success on the Merits

Based on the foregoing analysis, the Court finds that the Plaintiff is unlikely to prevail on its claim that the Regional Administrator's decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Therefore the first factor of the test weighs against the grant of a stay.

### B. Irreparable Injury to Plaintiff

■ The second prong of the four-part test for a stay or a preliminary injunction is for Plaintiff to establish irreparable injury if such relief is denied. The Sixth Circuit has established the parameters of irreparable harm to include "three factors: (1) the substantiality of the injury alleged, (2) the likelihood of its occurrence, and (3) the adequacy of the proof provided." *Ohio v. Nuclear Regulatory Comm.*, 812 F.2d 288, 290 (6th Cir.1987).

The substantiality of the injury alleged is great. Plaintiff maintains that its residents will be exposed to toxic substances in the air and water. PCBs are clearly dangerous substances that pose significant health risks to anyone exposed to them. Plaintiff has not provided adequate evidence, however, that exposure is ever likely to occur. The EPA conducted a two year study of Cell VI and has mandated specific procedures to ensure that all wastes remain enclosed within the disposal unit. The Cell is in a thick, relatively impermeable large-area clay pan. The bottom of the Cell liner is underlain by at least ten feet of clay with very low permeability. The Cell also is underlain by two synthetic membranes. Even if all of these systems should fail, WDI's facility contains redundant monitoring systems that would detect a PCB leak. Because PCBs are not free-flowing substances, it would take a significant amount of time for the PCBs to ever reach the groundwater. The monitoring wells are designed to detect contamination at the earliest possible instance, so that steps could be taken to clean up and remediate any problem before groundwater is affected. Furthermore, even though PCBs are not volatile substances that Van Buren residents would be exposed to in their air, the facility has nonetheless installed a system to monitor air quality. These systems make it unlikely that the public will ever be exposed to the PCBs stored at WDI's facility. The substantiality of injury caused by exposure is outweighed by the low likelihood of its occurrence. Therefore, this Court finds that the Plaintiff has not met the legal requirements to establish irreparable harm if a stay is not granted.

### C. Substantial Harm to Others

■ The third factor for the Court to consider in ruling on a request for stay is whether such action would cause substantial harm to others. Although WDI claims that it would be significantly impacted by a stay, the harm described appears to be largely financial, a factor entitled to less weight under the Sixth Circuit balancing test. *Ohio v. Nuclear Regulatory Comm.*, 812 F.2d 288, 290 (6th Cir.1987). Such harm to WDI would be purely financial, and the Sixth Circuit has held that "economic loss does not constitute irreparable harm, in and of itself." *Id.* While WDI's Vice President, Jerry Fore, stated in an affidavit that "WDI will lose many thousands of dollars if TSCA approval is ... stayed for any significant period of time," he also stated that there are over 150 Superfund cleanup sites in Michigan. Affidavit of Jerry A. Fore, attached to WDI's Motion to Intervene. Even if some of those sites chose to dispose of their PCB wastes at another facility, WDI would still be able to cover its lost profits by accepting waste from other sites.

Further, the Court finds that reasonable steps could be taken to ameliorate any financial harm that WDI might suffer if this Court granted the motion to stay. For instance, Plaintiff could post a bond to cover WDI's lost profits. For these reasons, the Court finds that the potential harm to WDI is not a significant factor weighing against a stay.

### D. Public Interest

■ The final factor to be considered is the impact of a stay on the public interest. Plaintiff understandably seeks to define the public interest by the strong opposition to the permit expressed by Township residents. The Court is mindful of the residents' concern, especially given the information about PCBs which has been disseminated over the last 25 years.

But if the nation is ever to manage its problems with hazardous and toxic substances, public interest cannot be determined simply by a community which would prefer that the wastes in question be disposed of elsewhere. Congress has defined the public interest in this area to be for the disposal of PCBs in a "reasonable and prudent manner," with consideration given to the "environmental, economic and social impact" of any proposed action. Congress thus intended that the public interest would be defined first by the public safety, and secondly by economics and other considerations. As discussed above, the Court finds that the EPA has met its obligation to attend to the safety of local residents, and that the establishment of a Michigan disposal site is likely to encourage the clean up of contaminated sites in this geographic area. The public interest therefore weighs against granting a stay.

### IV. Conclusion

For the reasons stated above, this Court hereby **VACATES** its April 29, 1997, Order staying the effective date of the permit and **DENIES** Plaintiff's motion to stay.

**SO ORDERED.**